**GOLDMAN v. POSTAL TELEGRAPH, Inc.**
Civil Action No. 342.

District Court, D. Delaware.
Nov. 23, 1943.

H. Albert Young, of Wilmington, Del., and Seymour M. Heilbron and Gerald Weatherly (of Hays, St. John, Abramson & Schulman), both of New York City, for plaintiff.

C. S. Layton (of Richards, Layton & Finger), of Wilmington, Del., and Eustace Seligman (of Sullivan & Cromwell), of New York City, for defendant.

LEAHY, District Judge.

Diversity and the requisite amount establish jurisdiction.

The occasion has never arisen for the Delaware courts to determine where a certificate of incorporation provides a preference stock is to be paid $60 per share upon liquidation before any distribution is to be made to the common stockholders whether an amendment under Sec. 26 of the Delaware Corporation Law[1] which attempts to provide that such preferred stockholder shall receive on dissolution less than the stated figure of $60 a share is valid.[2] Absent a precise holding by the state court, a federal court must examine all the available data as to what the state tribunal would probably decide under such facts.[3]

I. *The Plan.* Postal Telegraph, Inc., incorporated under the laws of Delaware in 1939 (herein called "Postal"), agreed to transfer to Western Union Telegraph Company (herein called "Western Union"), another Delaware corporation, all its assets. At the time of the agreement plaintiff owned 500 shares of non-cumulative preferred stock of Postal which, by the terms of Postal's certificate of incorporation, entitled all preferred stockholders to a payment of $60 a share on liqui-

---

[1] Rev.Code of Delaware of 1935, c. 65, Sec. 2058, p. 469.

[2] The proposition was present in the plan approved by the Delaware Supreme Court in Shanik v. White Sewing Machine Corp., Del.Ch., 19 A.2d 831, but, in fairness to the Delaware courts and counsel for plaintiff in that case who are also counsel for plaintiff in the case at bar, the proposition raised here was not even suggested in Shanik.

[3] It has been suggested, however, that the federal courts do not look to the state law where the corporate action taken constitutes a destruction of a right secured by the federal Constitution. See, Hottenstein v. York Ice Machinery Corp., 3 Cir., 136 F.2d 944, at page 953.

Whether the right affected in the case at bar falls within the dicta of the Hottenstein case will be discussed and ruled on in this opinion.

dation before any distribution could be made to its common stockholders. On July 5, 1943, defendant Postal proposed to its stockholders three resolutions authorizing (1) the sale of all its assets to Western Union, conditioned upon the approval by Postal's stockholders of an amendment to its certificate of incorporation referred to in (2); (2) the amendment of Postal's certificate of incorporation so as to provide that the holders of defendant's non-cumulative preferred stock would receive in lieu of $60 per share on liquidation one share of Western Union B stock;[4] and

[4] Prior to the amendment under Sec. 26, the provisions of Postal's certificate of incorporation with respect to the liquidating rights of the non-cumulative preferred stock provided: "(e) In the event of any liquidation, dissolution or winding up of the affairs of the Corporation, whether voluntary or involuntary, the holders of shares of the Non-Cumulative Preferred Stock shall be entitled to be paid, before any distribution or payment shall be made to the holders of the Common Stock or of any other class of stock ranking junior to the Non-Cumulative Preferred Stock, $60 per share plus all unpaid dividends thereon to the extent that the same shall be deemed to have been earned, as provided in subdivision (a) hereof, to the date of payment. In the event that at such date of payment the amount, if any, of the dividends deemed to have been earned on the shares of the Non-Cumulative Preferred Stock for the period between the dividend payment date next preceding such date of payment and such date of payment cannot be determined, dividends on the shares of Non-Cumulative Preferred Stock shall be deemed to have been earned at the full rate of $2.40 per share per annum for such period.

"After the making of such payment to the holders of the Non-Cumulative Preferred Stock, the remaining assets and funds of the Corporation shall be distributed among the holders of the Common Stock and of all other classes of stock ranking junior to the Non-Cumulative Preferred Stock according to their respective rights and shares. If, upon any such liquidation, dissolution or winding up of the affairs of the Corporation, whether voluntary or involuntary, the assets of the Corporation shall not be sufficient to provide payment in full of the amounts to which the holders of the Non-Cumulative Preferred Stock shall be so entitled, the amount distributable to the holders of all shares of the Non-Cumulative Preferred Stock shall be apportioned among them ratably, in proportion to the amounts to which they are respectively entitled."

The certificate of incorporation as amended provides: "(e) In the event of any liquidation, dissolution or winding up of the affairs of the Corporation, whether voluntary or involuntary, the holders of shares of the Non-Cumulative Preferred Stock shall be entitled to be paid, before any distribution or payment shall be made to the holders of the Common Stock or of any other class of stock ranking junior to the Non-Cumulative Preferred Stock, $60 per share plus all unpaid dividends thereon to the extent that the same shall be deemed to have been earned, as provided in subdivision (a) hereof, to the date of payment. In the event that at such date of payment the amount, if any, of the dividends deemed to have been earned on the shares of the Non-Cumulative Preferred Stock for the period between the dividend payment date next preceding such date of payment and such date of payment cannot be determined, dividends on the shares of Non-Cumulative Preferred Stock shall be deemed to have been earned at the full rate of $2.40 per share per annum for such period.

"*Provided, however, that notwithstanding the provisions of the next preceding paragraph in this subdivision (e) contained, if substantially all of the assets of the Corporation or of its operating subsidiaries are sold to the Western Union Telegraph Company then upon any liquidation, dissolution or winding up of the affairs of the Corporation the holders of shares of the Non-Cumulative Preferred Stock shall be entitled to receive for each share out of the assets of the Corporation (in lieu of the cash payments in said next preceding paragraph specified) one share of the Class B Stock of The Western Union Telegraph Company before any distribution or payment shall be made to the holders of shares of Common Stock; but they shall be entitled to no further or other participation in any distribution or payment.*

"After the making of such payment to the holders of the Non-Cumulative Preferred Stock, the remaining assets and funds of the Corporation shall be distributed among the holders of the Common Stock and of all other classes of stock ranking junior to the Non-Cumulative Preferred Stock according to their respective rights and shares. If, upon any such liquidation, dissolution or winding up of the affairs of the Corporation, whether voluntary or involun-

(3) formal dissolution of Postal. At the stockholders' meeting held on August 10, 1943, these resolutions were passed by a requisite vote over plaintiff's express objection. This suit followed.

The Postal-Western Union agreement provides that for the transfer of all the assets of Postal to Western Union, Postal will receive as part consideration 308,124 shares of Class B stock of Western Union. The entire amount of Class B stock to be received from Western Union will have a value substantially less than the aggregate liquidation preference of the preferred stock of Postal. Consequently, under its certificate of incorporation Postal's common stockholders—whose equity is deeply under water—would be entitled to receive nothing if ordinary liquidation occurred. Subject to various adjustments which do not have my immediate attention, Western Union will assume approximately $10,800,-000 of Postal's liabilities. Postal's economic position is shown by its steady losses, aggregating over $13,500,000 from February 1, 1940, to May 31, 1943. These losses have been financed, in part, by advances from the Reconstruction Finance Corporation. In facing further corporate existence, two courses were open to Postal: (a) To submit to government ownership or (b) to seek some type of merger with or absorption by Western Union.

In order to complete the proposed transfer of assets to Western Union, the vote of a majority of the outstanding stock of Postal was required under the Delaware law, sec. 65. See Rev.Code of Delaware of 1935, c. 65, Sec. 2097. Postal's outstanding preferred was 256,769.9 and the number of shares of common was 1,027,-076.6. Hence, if all the preferred voted in favor of the plan, it would still be necessary to obtain the affirmative vote of approximately 400,000 shares of common. In order to obtain such vote, Postal's directors determined it advisable that the preferred's rights on liquidation be modified, so as to provide that out of the 308,-124 shares of Class B stock of Western Union to be received by Postal, 256,770 shares would be distributed share for share for each of Postal's preferred and the balance of the Class B—51,354 shares—would be distributed to Postal's common stockholders, which was to be in the ratio of 1/20 of a share of Class B Western Union stock for each share of common stock of Postal.

As part of the plan, Western Union would also change its present 1,045,592 shares of capital stock into an equal number of shares of Class A stock without par value, which stock would be entitled to a non-cumulative dividend of $2 per share in each year before any dividends could be paid upon the Class B stock. After such dividend payment, the Class A and Class B stock are to participate on an equal basis in any dividends. I shall not pause, at this moment, to discuss certain collateral factors which entered into the considerations for the adoption of the plan, such as the former duplication of Postal's facilities with those of Western Union, the elimination of competitive factors, the more efficient utilization of personnel and equipment, the reduction of expense, improved service to the public, or the more effective means to compete with other methods of communication.

Plaintiff here seeks, on behalf of himself and all other non-assenting shareholders,[5] to enforce the liquidating rights which he contends are secured to him by the certificate of incorporation of Postal prior to the adoption of the resolution to amend it under Sec. 26. Defendant moved to dismiss on the ground that the complaint failed to state a cause of action.

Two issues are raised by the pleadings: (1) Whether the amendment to Postal's certificate of incorporation is authorized under Sec. 26 of the Delaware Corporation Law, and (2) if Sec. 26 authorizes the present amendment whether the statute to this extent is constitutional.

II. *The Delaware Law.* The national and Delaware bars generally together with the legal literature[6] especially have been

---

tary, the assets of the Corporation shall not be sufficient to provide payment in full of the amounts to which the holders of the Non-Cumulative Preferred Stock shall be so entitled, the amount distributable to the holders of all shares of the Non-Cumulative Preferred Stock shall be apportioned among them ratably, in proportion to the amounts to which

they are respectively entitled." (Italics supplied.)

[5] In addition to plaintiff's 500 shares, several hundred other shares are opposed to the plan.

[6] The Delaware decisions, as well as the decisions of other state and federal courts, involving corporate action taken under the Delaware statutes are dis-

unwilling to look directly at the radiations from the Delaware opinions which disclose what reclassification acts may be accomplished under Sec. 26 of the Delaware Corporation Law.

After much contemplation I concluded this is not the occasion to trace in limine the growth of the Delaware law in the field of corporate reclassification or re-arrangement of stockholders' rights in order to show the development of a logical pattern of judicial thought on this and allied questions. Because the Delaware decisions are so crystalline in outline, I am mildly surprised there could be disagreement of interpretation as to just what may not be accomplished under the corporation statutes of that state.

■ Defendant's certificate of incorporation provides that, in the event of liquidation or dissolution, the holders of preferred stock are entitled to be paid $60 per share, plus all unpaid dividends (of which there are none), before any distribution is made to the holders of the common or junior stock. Sec. 26 provides that an amendment to a certificate of incorporation may alter or change "preferences" theretofore provided for a preferred stock, if the vote of a requisite majority is had. Because at common law, in the absence of agreement to the contrary, all shares of stock, by whatever name they may be known, stand upon an equal footing, preferences, being in derogation of the common law rule, must be strictly construed. Gaskill v. Gladys Belle Oil Co., 16 Del.Ch. 289, 146 A. 337; Machen, Corporations, Sec. 517. Historically, preferential rights consist generally of two classes of preferences, viz.: (1) Preferences as to dividends and (2) preferences in distribution of assets upon liquidation, or winding-up.[7]

■ The right of preferred to priority in distribution of assets upon liquidation is clearly a preferential right within the meaning of the Delaware statutes. In Morris v. American Public Utilities Co., 14 Del.Ch. 136, 122 A. 696, 705, there was involved the right to reduce by amendment the redemption price of preferred stock from $105 per share to $100, the par value of the shares. In holding the amendment valid, the late Chancellor Wolcott wrote: "Whether such a change may be said to be the alteration of a preference within the meaning of, and therefore authorized by, section 26 I need not pause to consider, for section 13, which authorizes the issuance of preferred stock supplies sufficient authority for the change here involved. That section provides that any or all classes of preferred stock may be made subject to redemption at such price not less than par 'as may be expressed in the certificate of incorporation *or an amendment thereof* '". The Morris case is, in principle, applicable, since an analogous provision exists in Sec. 13 (Rev.Code of Delaware of 1935, c. 65, Sec. 2045, p. 464) with respect to the rights of the holders of the preferred stock upon distribution of assets. Sec. 13, after providing that every corporation shall have the right to issue one or more classes of stock with such preferences as may be stated and expressed in the certificate of incorporation or any amendment thereto, provides that "The holders of the preferred or special stock of any class or of any series thereof shall be entitled to such rights upon the dissolution of, or upon any distribution of the assets of, the corporation as shall be stated and expressed in the Certificate of Incorporation, *or any amendment* thereto * * *." (Italics supplied.)

It plainly appears, therefore, that Sec. 13 contemplates such rights are subject to amendment under Sec. 26. As the right of the preferred stockholder here involved is a preferential right within the meaning of the Delaware Corporation Law (i e., the stock is preferred on dissolution), I hold

cussed at length in Meck, Accrued Dividends on Cumulative Preferred Stocks: The Legal Doctrine, 55 Har.L.Rev. 77; Dodd, Fair and Equitable Recapitalizations, 55 Har.L.Rev. 780; Latty, Fairness—The Focal Point in Preferred Stock Arrearage Elimination, 29 Vir.L. Rev. See, too, Note: Corporate Recapitalization By Charter Amendment, 46 Yale L.Jour. 985.

[7] In Starring v. American Hair & Felt Co., 21 Del. Ch. 380, 191 A. 887, 890,

affirmed 21 Del. Ch. 431, 2 A.2d 249, it was said: "It [preferred stock] is of course a stock which in relation to other classes enjoys certain defined rights and privileges. These rights and privileges are generally associated with specified dividend and liquidation priorities." See, too, Garrett v. Edge Moor Iron Co., 22 Del. Ch. 142, 194 A. 15, affirmed sub nom. Pennsylvania, etc., Co. v. Cox, 23 Del. Ch. 193, 199 A. 671.

such right is subject to the amendment here involved under the particular language of Sec. 26. Peters v. United States Mortgage Co., 13 Del.Ch. 11, 114 A. 598.

III. *The Constitutional Question.* Plaintiff's main contention is that if Sec. 26 authorizes the action taken by Postal it is unconstitutional, because such action will result in the destruction of what plaintiff calls his "vested" or "property" rights. Obviously, the determination of this question depends upon whether one accepts or rejects plaintiff's primary postulate of what is a "vested" or "property" right.

 A person buying into a Delaware business corporation does so subject to the provisions of the particular charter and the Delaware Corporation Law. Delaware law assumes such person realizes Sec. 26 provides that *preferences* may be changed by a requisite majority vote. And preferred stockholders of a Delaware corporation when they buy into the particular enterprise accordingly consent in advance that whatever their preferences may be at the time they are subject to change by vote of the proper majority. See Morris v. American Public Utilities Co., and Peters v. United States Mortgage Co., supra. This is not a harsh rule. When parties purchase preferred stock in Delaware corporations, they are charged with knowledge that Secs. 13 and 26, as well as other sections, are impliedly written into their charter, Peters v. United States Mortgage Co., supra.[8] It is one of the fundamental concepts of the Delaware law that protection is afforded against arbitrary action in the requirement that a majority of those affected by the amendment must vote in favor of it. This democratic principle, based, in reality, on a worldly or practical necessity, is that the voice of a majority must be accepted as an expression of what is best for the whole. Moreover, another concept established by the Delaware decisions is that, assuming a grant of power by statute, the action proposed by the majority is not clothed thereby with a superior sanctity vesting such power with the attributes of tyranny. The exercise of such grant is always subject to the historical processes of the court of equity to gauge whether there has been an oppres-

sive exercise of the power granted, Allied Chem. & Dye Corp. v. Steel & Tube Co., 14 Del.Ch. 1, 11, 12, 120 A. 486. This is "fair and equitable" language. Where, as here, it is admitted there are no questions of unfairness involved, the only question remaining is one of classic constitutionality, involving only the contract clause and due process.

Plaintiff therefore contends that the rights of the preferred to priority of return of capital in distribution of assets upon liquidation are fixed, vested, or contractual rights and thus are constitutionally beyond reach of alteration by amendment under Sec. 26. Plaintiff presses the point that these preferential rights are analogous to the right of stockholders to accrued and unpaid dividends on preferred stock, and if it be said that Sec. 26 authorizes the alteration of such rights, then the statute is unconstitutional under the doctrine of Keller v. Wilson & Co., 21 Del.Ch. 391, 190 A. 115, and Consolidated F. I., Inc., v. Johnson, 22 Del.Ch. 407, 197 A. 489. In the Keller case the Delaware Supreme Court held that the amendment to Sec. 26 in 1927, permitting a change with respect to the "special rights" of a preferred stock, did not confer majority power to take from holders of preferred stock the right to receive dividends accrued prior to the amendment of the corporate charter. The corporation involved in that case had been organized and preferred stock issued before the amendment of 1927, while in Consolidated Film Industries v. Johnson, supra, the same rule was applied although the corporation was organized in 1928. The basis of both decisions was that the cancellation of the right to be paid a dividend already accrued through passage of time is not a mere amendment of a charter but an attempt to destroy a right in the nature of a matured debt, and a matter, therefore, not within the purview of the statute. And this is obviously the precise decision in those two cases.

Plaintiff insists, however, that the Supreme Court of Delaware held if Sec. 26 specifically authorized the amendments in question in those cases it was unconstitutional as against dissenting preferred stockholders. This is not, it seems to me,

---

[8] To say that in fact they have no such knowledge is to ask the courts to indulge in a judicial paternalism that would be limitless. Fixity of legal prin-

ciple would then be required to give way to judge-made theory of what should constitute corporate-stockholder cricket.

a correct implication to be gathered from those decisions. In the Consolidated Film case, 197 A. page 493, the court said: "Many interrelations of the State, the corporation, and the shareholders may be changed. But he, who contends that the State has conferred a power upon corporations, by charter amendment, to change such a substantial contractual right as the right to dividends on cumulative preferred stock accrued under the contract through time, should be able to point to statutory language so clear and precise as to permit of no reasonable doubt that a retrospective operation was intended." If we must enter the realm of the implied, then this language of the present Chief Justice of Delaware certainly indicates that if Sec. 26 had specifically authorized the amendment in the Consolidated Film case, there could be no constitutional objections to such amendment. I do not think the Delaware courts have left in doubt what position they would take in disposing of the constitutional question raised in the instant case. If they had been asked to decide whether Sec. 26 contemplates an amendment such as the one here under consideration, involving a "preference" on dissolution, I am certain they would have held the plaintiff's right to $60 on liquidation did not enjoy the qualities of a matured debt, but is indistinguishable from any other "preference" which is subject to alteration.

It is clear on principle there can be no constitutional objections to the present amendment. Since the corporation is the creature of the state, and since the corporation law is a part of the corporate charter (Peters v. United States Mortgage Co., supra), it is self-evident the state has the right to reserve to itself, or a majority or more of the stockholders, the power to change the contract between the corporation and its stockholders or between its different classes of stockholders by an amendment to the charter after such contracts are made, even if a particular class of stockholders must suffer slightly. If a rationale is sought for this reservation of power, then a more cogent reason than that which exists in the case at bar would be difficult to find. Here, the public interest has a stake. We are concerned with two of the great communicating systems of this country. Duplicity of effort gone, an attendant increase in efficiency and decrease in waste will naturally make the public beneficiaries, in part, by the absorption of Postal by Western Union. Viewed against the undoubted reservation of right by the state and the public interest involved, changes in liquidating preferences seem mild.

One reason why plaintiff has misinterpreted the Keller and Consolidated Film cases is that if plaintiff is right, those cases, in effect, overruled Morris v. American Public Utilities Co., and Peters v. United States Mortgage Co., supra, because there is no difference in substance in the nature of the rights involved in the various situations. I do not think the Delaware courts intended to overrule those cases in such indirect fashion.[9] For example, in Shanik v. White Sewing Machine Corp., Del.Ch., 19 A.2d 831, a plan was not disapproved which involved an amendment specifically reducing liquidating preferences, e. g., the old preferred was reduced on dissolution from $50 to $25.[10]

Plaintiff, however, in an attempt to bring the constitutional question into focus, relies strongly on Yoakam v. Providence Biltmore Hotel Co., D.C.R.I., 34 F. 2d 533. The court there held an amendment was valid which created classes of prior preferred stock, abolished the right to cumulative dividends prospectively, and abolished certain voting rights. But, the court held invalid a provision in the amendment which eliminated a sinking fund for the purchase and redemption of the preferred stock on the theory that the right of the preferred stock to look to this

---

[9] It is interesting to speculate that, in some situations, if the doctrine of the above cases has not been overruled by indirection, the result sought to be achieved in Keller v. Wilson can now be accomplished by sufficiently reducing the liquidating preferences other than the amount due for unpaid and accrued dividends by amendment under Section 26. This would not require appraisal and since the corporation has the power there can be no question of validity, Federal United v. Havender United Corp., Del.Ch., 11 A.2d 331; Shanik v. White Sewing Machine Corp., Del.Ch., 19 A.2d 831, in the absence of fraud. See Porges v. Vadseo Sales Corporation, Del.Ch., 32 A.2d 148.

[10] See footnote 2, supra, for the proposition that, perhaps, the Shanik case may not be said to have contained such a precise holding.

fund, which the certificate of incorporation provided should be augmented each year for the purpose of retiring all the preferred stock at a later date but prior to a contemplated dissolution or liquidation, could not be disturbed; and that portion of the amendment which looked to deprive the preferred stockholders of their right to the maintenance and operation of such sinking fund was unconstitutional, even if it be said that the preferred's rights fell within the statutory definition of a "special right". The basic holding of that case is, therefore, that the state of Delaware had made no such plenary reservation of power so as to impair the obligation of a contract between third parties, especially in view of the fact that the state was not a direct party to the contract between the different classes of stockholders.

Plaintiff argues on the basis of the Yoakam case that where constitutional rights are involved it is the duty of the federal courts to secure their protection even though state courts may fail to do so in analogous situations. I am aware of this principle. But, I am of the opinion that it is inapposite in the case before me for two reasons: First, the court in the Yoakam case failed to recognize that shareholders may constitutionally consent in advance to the alteration of rights such as are here involved.[11] Second, this circuit has indicated that constitutional questions do not lurk in action taken under Sec. 26 of the Delaware Corporation Law. In Hottenstein v. York Ice Machinery Corporation, 3 Cir., 136 F.2d 944, 948, a merger, involving a plan under Sec. 59 of the Delaware Corporation Law, Rev.Code 1935, § 2091, was attacked on the ground that to deprive preferred stockholders of their right to receive unpaid and accrued divi-

dends was an attempt to destroy a "vested right of property" and, under the doctrine of Keller v. Wilson & Co., such right was subject to protection under the contract and due process clauses of the federal Constitution. The court held that no constitutional question was involved in Keller v. Wilson & Co. and, consequently, there was no such question in the case before it. As I have pointed out above, I share the same view of the judges of this circuit of what was the precise holding of the Delaware Supreme Court in Keller v. Wilson & Co. In approving the proposition that a stockholder of a Delaware corporation when he buys into the enterprise consents in advance that a reclassification by way of amendment may have the effect of disturbing what litigants often refer to as "vested rights in property", Judge Biggs in Hottenstein, 136 F.2d page 950, going to the core of the question, wrote: "Such a right should not be given the status of a vested property right in view of the power of self-amendment conferred on the defendant by the 1927 amendment to Section 26 which was in force when the defendant in the case at bar was incorporated and when the charter amendment authorizing the issue of preferred stock was lodged with the Secretary of State of Delaware. In view of the power of self-amendment conferred upon the defendant we think it is clear that the intervening complainant may not claim the protection of the Contract Clause. We think for the reasons stated hereinafter that he is not entitled to make the claim that he is being deprived of his right without due process of law within the purview of the Fourteenth Amendment." It is clear the words of the court in Hottenstein are sufficient to support my present finding that plaintiff's constitutional argument is without merit.

---

[11] Even if the preferential rights involved here are safe from destruction by the federal Constitution, they are, like other constitutional rights, for the benefit of persons and may be waived by them in advance, as such persons see fit. In re Conway, 3 Cir., 121 F.2d 972, 975, it was said; " * * * the ability to waive a constitutional provision intended for the protection of one's property rights is elementary." What one school of thought considers the most precious of constitutional rights, viz., rights of the person in contradistinction to rights to his property, may be waived by the consent in advance theory. For example, an accused may waive trial by jury; Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854, 70 A.L.R. 263, and Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357; the right to assistance of counsel, Adams v. United States ex rel. McCann, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. ——, 143 A.L.R. 435; the right to protection against double jeopardy, Beard v. Sanford, 5 Cir., 105 F.2d 141. The cases indicate that the waiver may arise either by express language (comparable to the contractual language involved in the charter and the specific provisions of the statutory law of Delaware here applicable) or by a course of conduct indicating consent.

**771**

Plaintiff argues, however, that execution of the contract of sale of assets by Postal and Western Union on May 13, 1943, gave to preferred a present right to payment of $60 per share, and that its right to such payment on dissolution or liquidation then became a "fixed and vested right". But, the agreement of May 13, 1943, was not binding upon Postal, since by its terms it called for authorization by the vote of its stockholders. Allied Chemical & Dye Corp. v. Steel & Tube Co., supra. A sale of assets does not constitute a dissolution or necessarily call for a liquidation. Cleveland Worsted Mills Co. v. Consolidated Textile Corp., 3 Cir., 292 F. 129. Here, Postal might have continued to hold the Class B shares of stock of Western Union without distribution to its stockholders. In fact, such a course was suggested in its proxy statement which it sent to all its stockholders.

I conclude the execution of the May 13, 1943, contract for sale of assets to Western Union did not accelerate the preferential right of Postal's preferred stockholders to $60 a share on dissolution into a "vested right" which could not thereafter be altered by amendment under Sec. 26.

IV. *The Procedural Question.* At argument, plaintiff made his last contention that defendant could not agree to sell its assets conditioned upon the power of the corporation to amend its certificate of incorporation as a part of the transaction. There is no merit to this view. When the statute provides the amendment may be made from time to time, when and as desired, it means the amendment may be effectuated at any time; and there is no limitation with respect to the circumstances or the exigencies of the situation upon the exercise of the power. See Havender v. Federal United Corp., 23 Del.Ch. 104, 2 A.2d 143; 11 A.2d 331; Hartford Accident, etc., Co. v. Dickey Clay Co., Del.Ch., 24 A.2d 315. Craddock-Terry Co. v. Powell, 181 Va. 417, 25 S.E.2d 363, relied on by plaintiff, is distinguishable. In the Craddock & Co. case the corporation sought, in connection with the contract for the sale of its assets, to force the minority to take shares in the buyer corporation which were of a lesser value than the seller corporation's stockholders were entitled to receive under the liquidation provisions of the latter's certificate of incorporation. In that case, no attempt was made to pursue the statutory provisions for amendment; an attempt was made to accomplish by the contract of sale itself the alteration of the seller corporation's stockholders' preference rights. It is one thing to alter a preference pursuant to valid statutory authority; it is another to ignore a grant of power and attempt to accomplish the same result without the benefit of statutory reclassification.

In the case at bar, I see no reason why a Delaware corporation cannot agree to sell its assets conditioned upon the seller corporation amending its certificate of incorporation as a part of the transaction. In fact, such a condition may well become a part of the urgent necessities of a particular transaction. Here, for example, 256,770 shares of preferred, if entitled to $60 a share on dissolution, would be entitled to receive approximately $15,000,000 on liquidation. The present value of the Class B stock of Western Union to be received by Postal in exchange for its assets, at about $19 a share, admittedly amounts to only $4,888,000. If the preferential right of $60 a share remains unaltered, it would be impossible in this case to obtain the vote of the common stockholders in favor of the sale and dissolution, because there could not possibly be any rational basis, under the circumstances, for the common stock voting in approval. One thing is certain. Nothing can be accomplished, either in law or in life, by calling the recalcitrants names. The reality of the situation confronting Postal's management called for some inducement to be offered the common stockholders to secure their favorable vote for the plan. It seems to me of little moment whether that approval was voiced at one or two meetings. The fact is something had to induce the common stockholders to come along. This court and the Delaware courts have recognized the strategic position of common stock to hamper the desires of the real owners of the equity of a corporation, and the tribute which common stock exacts for its vote under reclassification and reorganization. Cf. MacCrone v. American Capital Corp., D. C.Del., 51 F.Supp. 462, at page 469; and MacFarlane v. North American Cement Corporation, 16 Del.Ch. 172, 180, 157 A. 396. And, as stated, separate meetings of Postal's stockholders could have been called to (a) amend under Sec. 26 and (b)

approve a sale of assets under Sec. 65; for purposes of convenience and the saving of expense, both steps were taken at one meeting. Nothing in the Delaware law forbids such a procedure. Secs. 26 and 65 contain no limitations on the time or the necessary circumstances which must exist for the exercise of the grant of majority power given under the statutes, except the procedural ritual contained in those statutes.

Accordingly, I conclude for the reasons hereinabove mentioned that defendant's motion to dismiss has merit. A form of decree for my consideration may be submitted upon notice.