**BARRETT et al. v. DENVER TRAMWAY CORPORATION.**

Civ. No. 345.

District Court, D. Delaware.

Dec. 3, 1943.

As Amended Jan. 6, 1944.

Stewart Lynch, of Wilmington, Del., and Andrew P. Quinn and Frank Licht, both of Providence, R. I., for plaintiffs.

Caleb R. Layton, 3rd (of Hastings, Stockly and Layton), of Wilmington, Del., and Erskine R. Myer and Charles J. Kelly (of Hughes & Dorsey), both of Denver, Colo., for defendant.

LEAHY, District Judge.

Diversity and the requisite amount establish jurisdiction. A reclassification plan of a solvent Delaware corporation involving alteration of rights of preferred stock presents the question. This is a modification of a type of plan which has recently become current. The plan proposes creation of prior preferred stock and an offer of such new shares to holders of present preferred in exchange for old shares by cancellation of existing claims to accrued dividends but preserving the right to such dividends in the form of a liquidating preference in the new stock. Present preferred which refuses to exchange is subordinated to the holders of the new preferred stock. Substantially similar plans have been approved on the bases of statutory and charter provisions authorizing creation of such prior preferred stock and alteration, generally, of existing preferences.[1]

Plaintiffs own 3200 shares of preferred. Defendant operates the single public transportation system in Denver, Colorado. Defendant's balance sheet, as of June 30, 1943, reflects a surplus of $1,155,151.18; a note attached, however, indicates a deficit of approximately $4,000,000. The evidence does not demonstrate the precise figure, but ap-parently there is a substantial deficit; at least, greater than the published surplus. From 1926 to 1943 defendant's bonded indebtedness has been reduced from about $8,000,000 to $3,000,000. Prior to 1938 and since defendant was reorganized in 1925 under federal statutes, the years have been lean. But after 1938 the profit or loss has been, in the light of past performance and war-time earnings, somewhat fabulous. E. g.,

| Year | Profit | Loss |
|---|---|---|
| 1938 | | $ 7,544. |
| 1939 | $ 26,518. | |
| 1940 | | 28,023. |
| 1941 | 121,356. | |
| 1942 | 770,275. | |
| 1943 to June 30 | 569,555. | |

No dividends were paid during the last twelve years. In view of recent increased earnings, management has been anxious to siphon off profits. During the past several years many plans of recapitalization have been discussed, analyzed, debated pro and con, rejected and reconsidered by defendant's directors. In 1927, Sec. 34 of the Delaware Corporation Law, Rev.Code 1915, § 1948 (35 Del.Laws, c. 85, Sec. 16, p. 244), was amended to permit payment of dividends out of net earnings in the face of capital impairment, subject to certain conditions. Management gave close scrutiny to the Delaware statute in its amended form. However, in 1941 company counsel advised that, because of specific provisions in defendant's certificate of incorporation, management could not take advantage of this particular Delaware statutory provision.[2]

---

[1] Recent reclassification amendments with minor variants have been upheld by the Delaware courts. Shanik v. White Sewing Machine Corp., Del. Ch., 19 A.2d 831; Morris v. American Public Utilities Co., 14 Del. Ch. 136, 122 A. 696; Hartford Accident & Indemnity Co. v. W. S. Dickey Clay Mfg. Co., Del. Ch., 24 A. 2d 315. Two Delaware cases, however, condemn such plans because of lack of statutory power to disturb unpaid accrued dividend rights by action taken under Sec. 26 of the Delaware Corporation Law (Rev.Code of Delaware of 1935, Sec. 2058). Keller v. Wilson & Co., 21 Del. Ch. 391, 190 A. 115; Consolidated Film Industries, Inc., v. Johnson, 21 Del. Ch. 417, 192 A. 603; Id., Del.Sup., 197 A. 489. Cf. Johnson v. Fuller, 3 Cir., 121 F.2d 618 (involving a Pennsylvania corporation) where resort is made to Delaware decisional law as an analogue to interpret the Pennsylvania Corporation Law.

[2] Plaintiffs argue that defendant has the right to pay current dividends even in the face of an impairment of capital by virtue of Sec. 34 of the Delaware Corporation Law and, thus, the present plan is wholly unnecessary; or, in any event, if there exists an impediment in defendant's charter, an amendment may be had under Sec. 26 to wipe out such provisions in order to take advantage of Sec. 34. I agree. Defendant's charter provision covering payment of dividends is merely an incorporation of the then (circa 1925) existing statutory provision, and is not a restriction within the meaning of Sec. 34 as amended. It is clear under the Delaware cases that statutory amendments are to be read into corporate charters, Davis v. Louisville Gas & Electric Co., 16 Del. Ch. 157, 142 A. 654; Gow

Refusing to be frustrated, management gave its undivided attention to its problem, and sought other expert legal assistance to explain what type of reclassification could be submitted to its stockholders in order to put its preferred on a dividend-paying basis. After a long labor, the instant plan finally came to fruition.

Plaintiffs admit a grant of statutory power under Sec. 26 of the Delaware Corporation Law exists to effect the plan sub judice. The sole question, then, is whether the present plan is fair to the preferred.

I. *The Plan.* Defendant was organized, or reorganized, on June 23, 1925 after going through a federal receivership washing. It now has issued and outstanding 104,412 shares of preferred of the par value of $100 per share and 61,240 no par shares of common stock. As of June 30, 1943, there were unpaid accrued dividends of $7,295,788.50 or $69.875 per share. The certificate of incorporation (now in effect) provides the holders of preferred stock shall be entitled to receive out of surplus, or net profits, when and as declared dividends of, but not exceeding, 7% per annum before any dividends shall be paid to common stock. These dividends as to the first 5% per annum are cumulative, whether earned or not, and as to the remaining 2% per annum are cumulative only when earned in any fiscal year. No dividends may be paid to common stock until after payment of current and accumulated dividends on preferred stock. In the event of dissolution, winding-up or liquidation, holders of preferred stock shall be entitled to receive out of the assets of the corporation so distributed, before any distribution shall be made to common stock, the par value of preferred shares and also an amount equal to all accumulated and unpaid dividends at the rate of 7% per annum to the date as of which distribution shall be made.

The proposed plan of recapitalization provides the total authorized capital stock of defendant shall be: (1) 208,824 shares of first preferred stock without par value; (2) 105,000 shares of preferred stock of par value of $100 per share; and (3) 62,000 shares of common stock without par value.

The plan also provides the holders of preferred shall have the right to receive 2 shares of the new first preferred in exchange for each share of old preferred. The plan contemplated by amendment under Sec. 26 provides further defendant's directors shall declare and order paid on each share of new first preferred a dividend of $2.50 per share for the calendar year 1943, and in each calendar year subsequent to 1943 they shall set aside and declare as dividends upon the first preferred an amount equal to 50% of the net profits or net income of the preceding fiscal year, and in case 50% of the net profits or net income of the preceding fiscal year shall be less than $2.50 per share upon each share of first preferred stock the directors, in addition to the payment of the required amount representing 50% of the net income or net profits of the preceding fiscal year, may in their absolute discretion declare upon each share of new first preferred stock an amount which will equal the difference between the amount required to be declared and $2.50 per share. In addition to the dividend of $2.50 per share per calendar year, the directors may declare an additional dividend not to exceed $1 per share per calendar year. Dividends on new and first preferred in the amount of $2.50 per share in 1943, and in the amount of $3.50 per share in years subsequent to 1943, shall be paid in full each year prior to the payment of any dividend on old and unexchanged preferred or common stock. Holders of unexchanged preferred stock are entitled, however, to dividends at the rate of 7% per annum before any payment

---

v. Consolidated Coppermines Corp., 19 Del. Ch. 172, 173, 165 A. 136, and that Sec. 34 as amended liberalized the power to pay dividends. The second time Wittenberg v. Federal Mining & Smelting Co., 15 Del. Ch. 351, 138 A. 352, came before the Delaware chancery court a similar argument was made and conceded to be sound.

However, plaintiffs' argument is simply directed at the main and only question presented, viz., fairness. In short, if a method is available to management to put preferred on a dividend paying basis

the stockholders should not have been told, as it is charged they were, that the only manner of effecting a plan of reclassification was that found in the plan submitted and now before the court. But, such statements from management must be viewed in the light of the Delaware law as to whether those representations constitute "bad faith" or "constructive fraud" or, after acting on advice of counsel, "an honest error of judgment." If the statements made by management were inaccurate, at most, they fall into the last category mentioned.

is made upon the common stock, but are not entitled to any dividends until after $3.50 shall be paid upon each share of new or first preferred stock. Dividends on old or unexchanged as well as new preferred stock are non-cumulative after January 1, 1944.

Dissolution provisions looking to winding-up or liquidation under the plan provide holders of new first preferred stock shall be entitled to participate in distribution of assets for each share of such preferred stock, issued and outstanding, in the proportion which $85.00 for each share of such preferred stock bears to the present par value per share of unexchanged preferred stock, plus unpaid accrued cumulative dividends per share on such latter stock through to December 31, 1943, prior to any distribution to common stock. If there is no old and unexchanged preferred stock outstanding at such time, each share of new preferred stock shall be entitled to receive, prior to any distribution to the common stock, the sum of $85 per share, but it does not share in any assets of the corporation remaining after payment of $85.

██ II. *The Legal Question.* To find what law determines "unfairness" in this type of case presents difficulties. In MacCrone v. American Capital Corporation, D.C., 51 F.Supp. 462, I applied the Delaware law, but at the same time, without the result changing, I made an independent analysis of the plan there involved in the light of the practical adjustments inherent in the particular transaction before me, cognizant that under Delaware law, where required statutory majorities have the right to take action looking to reclassification or rearrangement of stockholders' rights, a presumption arises of bona fides of purpose with a resultant burden on dissidents to prove that the action taken is so palpably unfair as to amount to constructive fraud.[3] The most recent announcement[4] from the Delaware courts declares that "When fraud of this nature is charged, the unfairness must be of such character and must be so clearly demonstrated as to impel the conclusion that it emanates from acts of bad faith, or a reckless indifference to the rights of others interested, rather than from an honest error of judgment."[5] As there is no statutory requirement of fairness in Delaware, standards of fairness must be found in the Delaware decisional law. The proof in the case at bar clearly indicates that no such fraud has been practiced by management and the majority stockholders for the reason that the evidence proves, for example, management is made up of men of integrity, honesty, and well-deserved reputation in the community in which they live. Those directors and officials of defendant who appeared before me were, if I am a judge of men, a type which the public (we are here involved with a city transportation system) as well as stockholder-investors are lucky to find. But the initial question which must be answered remains unanswered, viz., in examining a plan of reclassification, promulgated under the Delaware Corporation Law, may a federal district court leave the limits of the "gross unfairness" test, as fixed by the Delaware decisions, and look independently at the facts of each plan, in arriving at conclusions of unfairness.[6]

Several recent utterances recognize the question. In Black & Yates v. Mahogany Ass'n, 3 Cir., 129 F.2d 227, Judge Biggs was the first to say that federal courts must grant equitable remedies in accordance with their own rules developed from English chancery practice, without limitation or restraint by state law. With Black & Yates in mind, I suggested in Dunn v. Wilson & Co., D.C., 51 F.Supp. 655, that

---

[3] Allied Chemical & Dye Corp. v. Steel & Tube Co., 14 Del. Ch. 1, 120 A. 486; Cole v. National Cash Credit Ass'n, 18 Del. Ch. 47, 156 A. 183; MacFarlane v. North American Cement Corp., 16 Del. Ch. 172, 157 A. 396; Mitchell v. Highland-Western Glass Co., 19 Del. Ch. 326, 167 A. 831; Maddock v. Vorclone Corp., 17 Del. Ch. 39, 147 A. 255.

[4] Porges v. Vadsco Sales Corp., Del. Ch., 32 A.2d 148, 151.

[5] The extent to which the Delaware courts refrain from passing on "fairness" is indicated in Hartford Accident & Indemnity Co. v. W. S. Dickey Clay Mfg. Co., Del. Ch., 24 A.2d 315, involving a reclassification which called for increasing certain Class A shares which management had warned stockholders were to be used to pay dividends on preferred shares. Unfairness was charged. But the court held the question of unfairness premature on the ground the new shares might never be so utilized.

[6] At the current term of the Supreme Court, the present Chief Justice re-emphasizes, in Meredith et al. v. City of Winter Haven, 64 S.Ct. 7, the responsibility of the federal judges under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, to attempt to determine and apply state law in all diversity cases in which federal law does not govern.

it may be said a federal court in determining the equitable doctrine of laches applies its own rules without resort to state decisions. Most recently, in Eastern Wine Corporation v. Winslow-Warren, Ltd., Inc., 2 Cir., 137 F.2d 955, 960, Judge Frank writes: "Whether, in a suit in equity, the rule of Erie R. Co. v. Tompkins [infra] invariably applies has not yet been fully determined by the Supreme Court and is a question not altogether free from doubt, since the doctrine of the Erie case is now perhaps to be taken as founded upon the Judiciary Act of 1789 (28 U.S.C.A. § 725) which, by its literal terms, applies only to 'trials at common law'."[7]

■ Until the Supreme Court or this circuit determines otherwise, I conclude the view must be accepted that in determining whether a plan of reclassification, coming into existence by virtue of action taken under the authority of state statutes, which extend a grant of power to the requisite majorities, federal courts are not free from the duty of deciding the legality of the action taken except under state law, because questions of fairness or unfairness are matters of substantive law; and because, in addition, when a plaintiff in a diversity case invokes the jurisdiction of a federal district court, he is not alone seeking an equitable remedy in asking the court to declare a corporate reclassification plan "unfair", but he is essentially asking that court to determine that the action taken under the state statute is illegal.[8]

■ I am in error, of course, if my primary finding of what the Delaware law is has no basis in fact. In announcing my finding of what the Delaware law establishes, I am keenly aware of the fundamental rule, established by the Delaware decisions themselves, that, assuming the grant of power by the state statute, action taken by the majority is not clothed thereby with a superior sanctity vesting such power with the attributes of tyranny; but, the exercise of such grant is always subject to the historical processes of a court of equity to gauge whether there has been an oppressive exercise of the power granted.[9]

■ If a federal court is free to indulge an independent view of what constitutes unfairness in connection with action taken under Sec. 26 of the Delaware Corporation Law, then I conclude the present plan is unfair to the preferred stockholders. True, what we have here may be argued as an error of judgment on the part of management and majority stockholders. Ordinarily, courts do not substitute their views with respect to corporate matters where there is an honest error of judgment. Nevertheless, where a plan of reclassification fails to call on the junior stock to contribute pari passu with the preferred stock, especially where the junior shares have no present equity but merely a hope for asset appreciation and increased earnings, I fail to see, in the face of objection, why a state or federal jural dichotomy should sit idly by and sentence preferred shares to make the exclusive contribution when all rights should be whittled proportionately. Regardless of fraud and bad-faith questions, I believe it inequitable to allow the lower class to benefit to the detriment of the higher, in view of the traditional contract between preferred and common stockholders.

Here the preferred stocks are required to go a long way. The sole question in cases of this nature is: is the junior stock attempting to utilize its bargaining position to exact an unfair concession from the preferred?

An independent examination of the plan shows the way will be clear for the payment of dividends on all classes of

---

[7] See Russell v. Todd, 309 U.S. 280, 287, 294, 60 S.Ct. 527, 84 L.Ed. 754; and concurring opinion of Mr. Justice Jackson in D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 467, 62 S.Ct. 676, 86 L.Ed. 956, note 3.

[8] In Shanik v. White Sewing Machine Co., Del. Ch., 19 A.2d 831, 834, the Delaware Supreme Court held that the question of fairness, not having been raised below, was not properly before it. However, the court indicated that the question was properly—if only obliquely—before it "insofar as it is inextricably interwoven *with the issue of legality.*" (Italics supplied.)

[9] Indeed, I recognized this approach to the Delaware Corporation Law in Goldman v. Postal Telegraph, Inc., D. C. Del., 52 F.Supp. 763. But, even if a federal chancery court may scrutinize the exercise of the power under the Delaware statutes, having pronounced their definition of what constitutes "unfairness", the Delaware courts have actually determined the "legality" of the various plans before them. Hence, it is the actual decisions of the Delaware courts determining what plans are or are not legal which call for the operation of Erie R. Co. v. Tompkins, not the exercise of equitable functions by the Delaware or federal chancery courts.

stock provided the present rate of earnings continues. This substantially benefits the common stock. Under defendant's capital structure, common has no value where the cumulative dividend arrearage charge is in the amount of $7,295,788.50. This item must be paid before common can receive anything. That present earnings are abnormal and temporary emphasizes the benefit to the under water stock,[10] especially since the common stock is asked to give up nothing under the plan. The plan provides the old preferred stock will receive two shares of new first preferred stock for each share of old, and, in futuro, will enjoy (taking into consideration the two for one provision) the same dividend rates. Existing preferred does, however, lose the right to be paid any of its accumulated dividends out of current earnings until after the dividend requirements of the new preferred are met in full. The loss of such right is substantial in the face of the fact that present rate of earnings is large enough to permit a payment on account of accumulated dividends. Preferred is accorded no compensation for the surrender of this right. If defendant fails to operate at a profit in the future, which seems probable, preferred will have suffered a detriment for it would not only have failed to receive the dividends which the abnormal earnings might have justified, but it is also possible that part of the earnings may have been dissipated in the form of dividends to the common stock.

If a preferred stockholder does not exchange under the plan, he does not thereby enhance his position, as a new prior preference stock is ahead of him. While under Shanik v. White Sewing Machine Corp., Del.Ch., 19 A.2d 831, defendant has power to create prior preference stock, Shanik is not determinative of the question of fairness raised here. Since preferred receives nothing for what it is required to relinquish, I think the plan comes dangerously near being unfair under the Delaware decisions themselves. Porges v. Vadsco Sales Corporation, Del.Ch., 32 A.2d 148,

151, involved fairness with respect to relative changes in the rights of holders of defendant's two classes of stock, i.e., preferred and common. The changes were to be effected via merger. The common stock, as in the case sub judice, had no value but the plan gave potential value to it, because the old common had voting control. Under the plan of merger, that voting control passed to holders of old preferred stock. There were also provisions for voting rights of the new preferred stock as a class, provisions for pre-emptive rights, for a sinking fund, and for conversion into common stock. The Delaware court held such a plan not unfair in view of the various benefits which the preferred received in exchange for what it was required to relinquish. Chancellor Pearson said: "Again, the provisions for voting rights * * * are changes which may be of substantial value, depending upon future events. Surely, this is not a situation where the real and only purpose of the merger is to promote the interests of one class of stock to the detriment, or at the expense of another. In such a situation, the favored class would give up no benefits comparable to those it would receive; and the unfavored class would obtain no benefits comparable to those it would lose." He cited with approval a similar statement in MacFarlane v. North American Cement Corp., 16 Del.Ch. 172, 157 A. 396.

Thus, while one may detect a faint intimation from the Porges case that a plan which exclusively promotes the interest of one class of stock to the detriment of another would be held unfair by the Delaware courts, after applying the Erie R. Co. v. Tompkins litmus paper, I cannot truly say that such intimation gleaned from the particular facts of Porges is sufficient to sustain a conclusion that the Delaware courts have abandoned and no longer insist, in order to find unfairness, upon the presence of "constructive fraud", "bad faith", or "gross unfairness". One proposition is manifest, regardless of Delaware or any other law: the result of the present

---

[10] In Re United Light & Power Co., D. C., 51 F.Supp. 217, which involved a reclassification under the Public Utility Holding Company Act, 15 U.S.C.A. § 79 et seq., I held a plan fair which gave the under water common participation in the new capital structure even though the common did not vote on the reclassification. The reason for my holding was that the electric power industry was a growth industry and it was possible that the common might acquire some value in the distant future. That operative fact is not present here as the defendant's witnesses concede that their business is in a secular decline. Moreover, the equipment of defendant is in very bad shape and it simply cannot operate at a profit except in time of war when other methods of transportation are rationed.

plan is that preferred gets nothing for what it is required to relinquish; and the common is not required to give up anything.[11]

Where the practical necessities confronting corporations today burdened with heavy dividend arrearages challenge management, in its effort to effect a fluidity of earnings into the pockets of all the owners of the corporation, the plasma supplied by statutory reclassification under the Delaware law should be utilized to postpone ultimate payment of back dividends, as here, and remove the impediment of payment of current dividends to all classes of stock only where the junior shares are willing to give a quid for such quo. Even if an independent view existed, it would be improper, at this time, to say what the quantum of the common's contribution should be. Plaintiffs' counsel frankly suggested, when I put the question to him direct, the junior shares should receive one share of new common in exchange for three shares of old common, or that 75% of the present common should be given to holders of the new preferred, eliminating the provision in the plan which provides that present preferred may have the option to exchange for new preferred.

It is inappropriate to decide in advance what mathematical exchange would constitute a fair plan. But, if free, I would attempt a therapeutic by calling a new meeting of common stockholders in order that they might have the chance to decide how much they were willing to contribute to the plan in the light of the views I have expressed as to the essential worth of common stock in these corporate situations. After such action, any court could pass on the fairness question. However, I recognize after such vote is taken, it might result that the common stock would refuse to retreat from its asking-price for its vote-buying. A deadlock would probably then result.

It is redundant to suggest that it is necessary to obtain the vote of junior stock in order to put defendant on a dividend-paying basis. The leverage of common stock, where reclassification is contemplated under the Delaware Corporation Law, must be recognized as a strategic position. The tribute which junior shares require, under such plans, from the real owners of the equity of a corporation was the subject of my comment in Goldman v. Postal Telegraph, Inc., 52 F.Supp. 763, at page 771. Where common stock demands vote-buying, a court should evaluate nicely the junior stock's relative position in the light of the fact that in many cases such shares are subordinate both as to cumulative, unpaid dividend arrearages and liquidating preferences, and are, therefore, so deeply fathomed that they have no actual ownership in the corporate enterprise. While a plan of reorganization may be had under federal law, in many instances, without the vote of junior water stock, the Delaware Corporation Laws make no provision for disfranchising junior stock which is found to have no worth. It is clear, the present and allied situations call for Delaware legislative inquiry, if that state is to maintain its traditional resiliency in adopting its legislative procedures to the dynamic economic changes which face business enterprise in this country. A workable statutory procedure could be provided for ascertainment of worthlessness of junior shares, after which, as a condition subsequent, the junior stocks' vote would not be necessary to effect an urgent reclassification plan. The brevity of federal statutory provisions have met the problem posed with a resultant symmetry of judicial interpretation adaptable to the pressing and realistic needs of corporations. Presently, however, the federal and state approach is atypical, and will remain so until the Delaware statutory or decisional law takes on a different hue. Dodd (Fair and Equitable Recapitalizations, 55 Har. L.Rev. 780) has written: "Judicial vetoes on recapitalization plans in which junior shareholders exploit their voting powers might have unfortunate consequences in particular cases, but they would bring the defects of our existing provisions concern-

---

[11] The preferred stock has full voting rights and has sole voting power in the election of directors when any cumulative dividends are in arrears to the extent of one-quarter of one per cent or more for the period of one year or more. Under the plan each share of first preferred stock enjoys one vote at all meetings of stockholders. It is apparent that common stock does not have voting control and will not enjoy it under the plan. While common's relative voting participation will be less if all preferred stockholders should exchange under the plan, it is nevertheless true that the new first preferred will not have sole voting power in the election of directors when cumulative dividends fall into arrears. I do not, therefore, think it can be said that preferred stockholders will gain any substantial voting benefits from the plan.

ing corporate voting forcibly to the attention of the legislatures. It is high time to break the vicious circle of inequitable distribution of voting power leading to inequitable plans which equity finds itself powerless to improve and therefore feels constrained reluctantly to accept."

But my views are ineffectual in the light of my conclusion that the Delaware law controls. As there can be no possible finding of fact from the evidence adduced here to which the Delaware symbols of "constructive fraud" or "bad faith" or "gross unfairness" may attach, the legal formula established by Delaware compels the result that plaintiffs' charge of unfairness can not be sustained. In view of the substantial interests represented by the many hundreds of Delaware corporations which are faced with questions of reclassification wherein many types of preferences are called upon to be altered, and in view of the further fact that there is seldom, if ever, any question of lack of corporate power under the present Delaware statutes, in most instances the only question before courts called upon to interpret the law of that state is whether the acts of statutory reclassification taken are fair or unfair. As I believe it highly important to know whether federal courts test this question by the application of federal standards independently of state law, I have thus written, at length, "with the hope that it will arrest the attention of the reviewing court." Metropolitan Edison Co. v. Federal Power Comm., 3 Cir., 94 F.2d 943, 952; General Electric Co. v. De Forest Radio Co., 3 Cir., 44 F.2d 931, 946.

For the reasons stated, I am of opinion the complaint must be dismissed. After proposed findings of fact and conclusions of law have been presented for my further consideration, a form of decree may be submitted upon notice.