**In re UNITED GAS CORPORATION et al.**

**Civ. A. No. 471.**

District Court, D. Delaware.

Nov. 20, 1944.

504

Morton E. Yohalem, of Philadelphia, Pa.,
Sidney H. Willner and Emanuel J. Frei-

berg, both of Philadelphia, Pa., for Securities and Exchange Commission.

C. S. Layton (of Richards, Layton & Finger), all of Wilmington, Del., James L. Boone (of Reid & Priest), all of New York City, and George T. Naff, of Shreveport, La., for United Gas Corporation.

Wallace P. Zachry and Daniel James (of Wright, Gordon, Zachry, Parlin & Cahill), all of New York City, for Electric Power & Light Corporation.

John F. MacLane and Robert H. O'Brien (of Simpson, Thacher & Bartlett), all of New York City, for Electric Bond & Share Co.

Leo B. Mittelman, of New York City, for Jennie Britton, stockholder of Electric Power & Light Corporation.

Samuel Okin, of New York City, pro se.

LEAHY, District Judge.

1. The background of the plan is found at p. 9 of the SEC's opinion. It there states:

"The filing of the present plan marked the culmination of a protracted consolidated proceeding involving filings by the companies and proceedings instituted by the Commission under various sections of the Act.

"Among the filings of the companies included in this consolidated proceeding was a declaration filed by United and certain of its subsidiaries seeking approval for the issuance and sale by United of $75,000,000 principal amount of first mortgage and collateral trust bonds, 3-1/4% series due 1958, to 14 insurance companies at a price of 99.34. It was proposed that net proceeds of such sale would be used (1) to retire $28,850,000 principal amount of Public Service 6% debentures due July 1, 1953, assumed by United, $25,000,000 principal amount of which is held by Bond and Share and $3,850,000 principal amount by Houston Gas Securities Company, all of whose capital stock was owned by United; (2) to pay its 6% demand note in the principal amount of $25,925,000 held by Bond and Share; (3) to repay an open account indebtedness of $2,000,000 to Bond and Share; and (4) to purchase $6,000,000 principal amount of First Mortgage and Collateral Trust Bonds, 4% series due 1961, to be issued by Pipe Line.

"The declaration did not propose or contemplate any changes in the security structure of United junior to the debt to be re-

tired except that it stated that United's management was 'considering recommending' the use of a substantial portion of the remaining proceeds for payment of the dividend arrearages on the $7 preferred stock of United then amounting to $9,502,490.

"The other filing involved in the consolidated proceeding was a declaration concurrently filed by Bond and Share seeking approval of its use of the approximately $53,365,000 which it would receive from United under the above specified declaration together with some $6,000,000 from its own treasury to reduce its outstanding preferred stock.

"Facts had previously been developed in our 11(b) (2) proceedings with respect to Electric Bond and Share Company system (File No. 59-12) which gave rise to prima facie questions with respect to the role played by Bond and Share in the organization and history of United and its impact upon the status of the debt claims held by Bond and Share in United. Moreover, consideration of the financial condition of United indicated serious prima facie questions as to the existence of an unfair and inequitable distribution of voting power and the need for an extensive revision of its security structure in order to remedy such condition. Accordingly, and in order to deal effectively with these problems our order of May 31, 1941 for hearing on these declarations not only raised these questions as issues to be considered in connection with the filings but also instituted proceedings with respect to Bond and Share, Electric, United and certain subsidiaries of United under Sections 11(b) (2), 12(b), 12(c), 12(f), 18(a) and 18(b) of the Act which were consolidated for hearing with the proceedings on the above described filings. As we previously stated 'The purpose of these "cross proceedings" was to ensure a comprehensive investigation of all factors relevant to the recapitalization and refinancing of United including a determination of the respective claims and equities of its various security holders in connection therewith and to give notice of our intention to exercise our full statutory powers to resolve the problems facing the company.'

"In accordance with the Notice and Order for Hearing described above, public hearings were held with respect to the many issues involved in the consolidated proceedings from June 16, 1941 until Janu-

ary 29, 1942. By reason of the unsettled state of the money markets after Pearl Harbor it was thought advisable by the staff of the Commission and the companies involved to attempt to devise a program under which United could carry out its contract to sell the bonds without prejudice to the future determination by the Commission of the issues involved in the proceedings instituted by it. Accordingly, the hearings were continued while discussions were had with this end in view.

"After a long series of negotiations which culminated in the formulation of a program, the management of Bond and Share decided that it could not acquiesce therein without stockholders' approval and that it would be impractical to obtain such approval. The program was therefore abandoned. Thereafter, hearings were resumed with respect to all phases of the proceeding until September, 1943 when they were completed and concluded with respect to all matters except the accounts and structures of certain of the subsidiary companies of United.

"Following the close of the record on the major problems in the proceedings, discussions were had looking to the development of a voluntary program for the settlement of the issues in the consolidated proceeding which resulted finally in the formulation and filing of the present Section 11(e) plan. A summary of these facts concerning the organization and history of United with special reference to the origin of its present securities as developed in the more than 9,000 pages of testimony and approximately 1,000 exhibits making up the record in the previously consolidated proceeding which formed the background for the formulation of the present plan, is annexed hereto as Appendix A."[5]

This background shows that the Commission, commencing in June, 1941, made an independent investigation and analysis of United's debt to Bond and Share, as well as all interest and service charges paid. The scope of the entire hearings is indicated by the 11,000 pages of testimony and the 1,-500 odd exhibits, which are now before this court, all of which cover the period up to September 21, 1943, when the hearings were closed. In the early part of 1942 it became apparent that grave questions lurked behind the conflicting claims. United's original proposal for re-financing

was held in abeyance. By the end of 1943 it became apparent that, unless the interparty claims could be adjusted as elements of a plan, it was highly unlikely that further progress would be made, for the reason that Bond and Share was adamant that its debt was valid from its inception and that all of its transactions with United met all legal and equitable standards as United's controlling stockholder. The Commission's view was that United's debt to Bond and Share could not fairly and equitably be paid in full and that the claim should take a definite form of subordination. A resulting compromise was worked out which met with the approval of the Commission and the companies involved, resulting in the plan now before the court. The plan has a definite purpose. Simplification of capital structure, with a basis of a par value $10 common stock and debt, is desired, by the elimination of United's entire existing debt, preferred and second preferred stocks, with accumulated dividend arrearages, with a consequential saving on fixed dividend charges, and the cancellation of all outstanding option warrants. There will result a simplification of Electric's holding-company system, consistent with that company's individual plan filed with the Commission under Sec. 11(b); a compromise and discharge of numerous claims and counterclaims among the three companies and their security holders and a fair and equitable distribution of voting power among such security holders, the SEC found, will result.

In particular, Bond and Share relinquishes its claims and ownership in United —represented by $25,000,000 principal amount of 6% debentures of United Gas Public Service Company (due 7-1-53) assumed by United, United's 6% demand note for $25,925,000, 6% open account of $2,000,-000, 17,310 shares of $7 preferred stock, 752,666 shares of common stock, 151,005 option warrants, and $440,000 principal amount of 5% Collateral Trust Gold Bonds of Houston Gas Securities Company (due 3-1-52) assumed by United—all for the sum of $44,000,000 in cash. Electric gives up the $7 second preferred stock issue with the heavy accumulated dividend arrearage, and both its holdings of common stock and option warrants for 10,108,101 shares (94.9%) of the new $10 par common stock. The publicly owned common stock in the

---

[5] This appendix may be found attached to the original Sec. 11(e) petition filed in this court. It consists of some 92 pages.

amount of 3,271,207 shares (41.83%) which has a par value of $3,271,207 gets 545,201.2 (5.1%) of the new common which is to have a par of $5,452,012. The 432,512 shares of $7 preferred publicly held will be redeemed at $110 plus all unpaid accumulated dividends. Without compensation, all option warrants are to be abolished.

The plan goes into action by a dozen steps: (1) by United selling $100,000,000 of its First Mortgage and Collateral Trust Bonds to the public which will be a first lien on all of United's physical assets, said bonds to be further secured by a pledge of all United's holdings in its direct subsidiaries;[6] (2) for $44,000,000 cash Electric acquires Bond and Share's claims against United; (3) Electric makes a capital contribution to United of 17,310 shares of its $7 preferred which United will cancel; (4) United redeems at $110 plus accumulated dividends 432,512 shares of $7 preferred held by the public out of the proceeds of the sale of its (new debt) First Mortgage and Collateral Trust Bonds (estimated to take $53,000,000); (5) United will pay a dividend on its $7 second preferred (884,680 shares), all held by Electric, of 12,385,520 shares of its $1 par common for Electric's cancellation of its $12,385,520 accumulated dividend charge; (6) Electric will accept 44,468,000 shares of $1 par common in exchange for 444,680 shares of United's $7 second preferred, with accumulated dividend claims which will also be cancelled; (7) United is to purchase for $44,000,000 cash Electric's remaining 440,000 shares of second preferred, with the same dividend charge, Electric thereupon passing the $44,000,000 over to Bond and Share as consideration of the acts referred to in (2) supra; (8) Electric makes a capital contribution of the open account and securities (including option warrants) of United which it acquired from Bond and Share; (9) United by proper corporate action will give an additional 2/3 of a share of common stock to its common stockholders (with requisite transfers from items capital surplus to stated capital); (10) the residue of United's proceeds from the sale of its new bonds will pay off the $3,460,000 publicly held 5% bonds of Houston Gas Securities Company (due 3-1-52) which United assumed; (11) appropriate amendments to United's charter will be made under the Delaware Corporation Law, resulting in the elimination of its preferred stocks and a transmutation of its 106,533,022 shares of old $1 par common into 10,653,302.2 shares of new $10 par common, on the basis of ten old for one new; and (12) all option warrants are to be abolished.

█ 2. There is necessity for the plan. The SEC found that the voting power of United was unfairly and inequitably distributed. Control lies in the common stock, which is under water. United's current earnings cannot meet dividend requirements. Common's claim on both earnings and assets is growing progressively more remote, and it is more than highly speculative that its claim will ever swing back into the orbit of a dividend earning stock. There have been dividend arrearages applicable to the $7 preferred stock throughout the past 12 years; these arrearages have been reduced to $8.12 1/2 as of June 1, 1944 as a result of payments commenced in 1939. The $7 preferred stock has no voting power. The second preferred which would be entitled to United's entire earnings after its senior preferred's arrearages had been provided for has only a fourth of voting power of United. The vote problem alone is sufficient necessity for a reorganization of United's capital structure in order to effect compliance with the Act. The SEC was of opinion that "Inequitable distribution of voting power can not be cured merely by transferring voting power to senior securities, leaving outstanding junior securities representing little or no interest in the enterprise; and in such cases we have concluded that the only adequate way to redistribute voting power is to secure it upon the holders of new securities in an enterprise recapitalized on a sound financial basis." Whereas the corporation laws of the various states respecting reorganizations and recapitalizations make no provision for the modification of voting control where junior stocks are found to be worthless, asset-wise and earnings-wise, the Congress, however, in enacting the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq., has made specific provision that where the junior stocks of public utility companies are worthless there should be no inequitable distribution of

---

[6] The SEC has approved the terms and conditions of this financing. See Holding Company Act Release No. 5363, Oct. 21, 1944.

voting power.[7] In applying the Act, it is not necessary in every instance that vote control should shift to senior securities or should shift at all during the course of carrying the plan into effect. See In re North Continent Utilities Corporation, D. C.Del., 54 F.Supp. 527, 530. But here is a case where something should be done with voting control. True, Electric which now has voting control will keep it under the plan, but that control will eventually find itself in the hands of the public, for it has been determined that Electric will, in compliance with the Act, dissolve. See American Power & Light Co. v. Securities and Exchange Commission, 1 Cir., 141 F.2d 606. The proposed plan attempts to distribute voting power by classes. It results in equitable treatment to United's direct security holders. The conclusion is, then, that a reorganization of United is "necessary to effectuate the provisions of Sec. 11(b) of the Act."

It is at this point that the objector Okin argues lack of jurisdiction because United is not a holding company within Sec. 2(a) (7) of the Act. He asserts that (by reason of Sec. 11(b) (2) of the Act, which provides: "Except for the purpose of fairly and equitably distributing voting power among the security holders of such company, nothing in this paragraph shall authorize the Commission to require any change in the corporate structure or existence of any company which is not a holding company, or of any company whose principal business is that of a public-utility company.") the Commission and the court are without jurisdiction to approve the plan. This point is without substance. It has been held that where inequitable distribution of voting power is found to exist, a plan may be approved to change the capital structure of a non-holding public utility company under the Act in order to vest voting control in securities representing the real owners of the equity. In the instant case an alteration of United's capital structure is a prerequisite to an equitable distribution of voting power. See In the Matter of Jacksonville Gas Company, D.C., 46 F.Supp. 852; In the Matter of Electric Power & Light Corporation, SEC Holding Company Act Release No. 5040; Southern Colorado Power Company, SEC Holding Company Act Release No. 4501, D.C.Colo.1944, plan enforced without opinion; Puget Sound Power & Light Company, D.C.Mass.1943, plan enforced without opinion; In re Laclede Gas Light Company, D.C., 57 F.Supp. 997.

3. In addition to the point just discussed Okin raised other objections to the plan. For example, he raised an additional jurisdictional question. He contended that as he had taken an appeal, under Sec. 24(a) of the Act, to the Circuit Court of Appeals for the Second Circuit, in which proceeding he sought to review the September 7, 1944 order of the Commission approving the plan, this court's power to review the plan under a Sec. 11(e) proceeding was suspended until after his appeal had been determined. It is unnecessary to discuss this portion of Okin's argument for the Sec. 24(a) court rejected his contention and held that the district court proceedings, here, should proceed. See Okin v. Securities and Exchange Commission, 2 Cir., 145 F.2d 206.

The most serious of Okin's objections against the plan are found in his charges that the staff of the Public Utilities Division of the Commission "and/or the member or members of the said Commission" compelled by fraud and duress "the promulgation of the plan of United Gas Corporation" and compelled "the Electric Bond and Share Company to join in and agree to the terms of the said plan." Without further discussion, I find that this charge has no basis in fact. My difficulties at the hearing in attempting to have Okin explain what it was he intended to prove in this connection may be found in a memorandum I filed during the course of the hearing and before its completion, which is set forth in the marginal note.[8]

---

[7] For discussion of the voting power of worthless junior stocks, see Barrett v. Denver Tramway Corporation, D.C. Del., 53 F.Supp. 198, affirmed 3 Cir., 146 F.2d 701; MacCrone v. American Capital Corporation, D.C.Del., 51 F.Supp. 462; Goldman v. Postal Telegraph, D.C.Del., 52 F.Supp. 763; and also 57 Har.L.R. 894.

[8] Memorandum: October 3, 1944.

The Securities and Exchange Commission finished its proofs in support of the plan. I then asked Mr. Okin if he desired to offer proof in opposition. At page 106 of the transcript of testimony I asked for his offer of proof. He made the following reply:

"In support of my claim, sir, to show that the proposed plan is a fraud upon the stockholders of Electric Bond and Share, and as a result of duress brought

to bear upon the company by the staff and possibly the Commission."

At page 107 I again asked Mr. Okin what he intended to show. His reply was: "To prove this entire picture beyond a question of a doubt."

At page 108 I again asked for an offer of proof. Mr. Okin replied that he was offering proof in support of his affirmative defenses appearing on pages 4 to 13, inclusive, of his pleading in the nature of an answer. The fact is that paragraph 15 of his second affirmative defense is the only place where he alleges fraud and duress.

As the proceedings progressed, counsel for all the companies involved made clear statement that no duress was exercised upon them or their clients by the SEC. As the staff of the Commission was of the view that there should be some alteration of Bond and Share's creditor rights vis-a-vis United, the staff's proposition was not, at first, acceptable to the attorneys for Bond and Share. Accordingly, counsel for that company were of the view that it may be said that this was a kind of "duress"; but they freely admitted it was not duress as known in the law when that term is used in connection with the doing of an unwilling act.

Once again, at page 129, I asked Mr. Okin for a detailed offer of proof of any duress exercised by the Commission or its staff. The record discloses I received no satisfactory answer. Again, at page 130, I asked for an offer of proof showing duress. Same result. Finally, at page 131, the offer of proof was stated to be that it would be shown that the Commission acquiesced in everything that its staff recommended; that after Bond and Share had informal discussions with certain members of the Commission it became known that the recommendation of the staff would be followed by the Commission.

Thinking that the offer of proof was obviously inadequate, at page 135 I again asked Mr. Okin to read his offer of proof into the record. He then stated that he would show that in November 1943 the staff of the Commission and/or the Commission had certain proposed findings, opinions and recommendations which looked at the entry of an order prohibiting the payment of principal and interest on the debt obligations of United to Bond and Share; and it was because of the staff's proposed recommendations to order the cessation of such payments that Bond and Share felt compelled to agree to a plan which provided for a reduction of such debt claim against United to $44,000,000 from some fifty-odd million.

On this offer of proof, which at the time I thought far from precise, I nevertheless permitted Mr. Okin to call Mr. Murphy, president of Bond and Share, to take the stand. However, I stated I would limit the testimony to the fact as to whether the staff and the Commission had actually issued the or-else ultimatum to the company involved. Prior to Mr. Murphy taking the stand, Judge MacLane, attorney for Bond and Share, asked to make a statement for the record. At page 139 he said that his company had been willing to accept the figure of $44,000,000 in satisfaction of a compromise and settlement of its debt claim because his company was confronted with the certainty of an adverse recommendation by the staff to be made to the Commission and which, if the Commission should approve, would subject the company to endless litigation in defending some thirteen pending lawsuits in the New York state and federal courts. In his own words he said: "There was that much duress and no more in the thing." He was clearly of the opinion, however, that if the staff recommended and the Commission ordered that there should be a suspension of interest payment on the debt of United to Bond and Share until all the issues were finally decided by the Commission, there was nothing illegal in such a determination, especially in view of the fact that there was legal precedent for entering such an interim order.

At this point, I asked Mr. Okin what he intended to show beyond these admitted facts. It was difficult, if not impossible, to receive a direct reply. Then, I concluded as Mr. Okin refused to give me a specific offer of proof beyond the admissions made by all of the parties, I would, in order to give him his day in court, rule liberally in his favor and allow him to begin the examination of Mr. Murphy, with the thought in mind that if, in the course of the testimony, it became clear to me that there was no possibility of a showing of real legal duress exercised by the staff of the Commission or the Commission, I would terminate Mr. Murphy's testimony and close the door to any further testimony from any other witness, unless Mr. Okin could specify his offer of proof by giving the date, the place and the names of the persons who were present, as well as a statement of the form that the duress took at the time it was operative.

In permitting Mr. Murphy to take the stand I did not intend to establish a precedent that in a Sec. 11(e) proceed-

■ Another of Okin's charges[9] was that the proposed plan was contrary to public policy in that the parties were attempting to avoid payment of certain income taxes to the United States. No evidence of any kind was offered to support this allegation. A review of the record of the proceedings before the Commission likewise fails to disclose any merit to Okin's contention that he was denied a fair and impartial hearing before the Commission or that he, as he argued, was "deprived of his property without due process of law and in violation of the Constitution of the United States."

■ 4. After analysis of assets and earnings, the Commission found that the ratio of the new $100,000,000 debt to net property will be approximately 51.15%. A study of operating revenues from 1931 to 1943 indicates growth. While the amount of the new debt is comparatively high, it is estimated that the amount of natural gas and oil supply will meet requirements for the next 30 years which is practically twice the life of the new bonds. The Commission, therefore, found that, in view of the earning coverage of the new bonds and the reduction of the debt through the proposed sinking fund requirements designed to retire $80,600,000 (80.6%) of the new issue by maturity,[10] together with the simple common stock structure, the issuance of the new bonds above the common stock makes the proposed plan not only necessary but also appropriate to effect compliance with the Act. I agree.[11]

■ 5. The requirements of Sec. 11 (e) that the plan be "fair and equitable" to the persons affected thereby have been met. The test first applied in this court consisted of a comparison of the creditors' and stockholders' contract rights (or, as suggested, "the whole bundle of rights") with the rights to be received under the plan of reorganization or recapitalization. See In re United Light & Power Co., D.C. Del., 51 F.Supp. 217, affirmed sub nom. In re Securities and Exchange Commission, 3 Cir., 142 F.2d 411; and the SEC's Holding

---

ing there is a trial de novo. But, here, we had a serious charge against the Commission which was directed at the very vitals of the plan, because no plan could be fair and equitable where its genesis is formed in duress.

Since last Friday I have read carefully the transcript of the proceedings which took place on Friday, and I made a special analysis of Mr. Murphy's testimony. Although this particular testimony, according to Mr. Okin's desires, is far from completed, I am clear that it proves beyond doubt that there was no active duress at any time during the proceedings before the Commission. It lies within the discretion of a court to terminate a witness' testimony and to refuse to hear other witnesses where a judge is of the belief that further testimony will obviously become irrelevant and prolix.

A Sec. 11(e) proceeding is no place to indulge in a fishing expedition. When you come to court to object to a plan as not fair and equitable, or necessary and adequate to effectuate compliance with the Act, you have proof of duress or you do not. If you have it, you can articulate your offer of proof clearly and with preciseness. I hold, therefore, that unless Mr. Okin can meet the requirements of a proper offer of proof, as I have defined it above, I shall consider this proceeding at an end.

Note: After the foregoing memorandum was filed I had no further success in attempting to have Okin state what his proof of duress was to be.

[9] In addition Okin charged that sufficient notice to security holders of the proceedings before the Commission had not been given. This contention is without foundation in fact. On March 6, 1944, security holders were notified of the hearing before the SEC, which notice stated that the proceedings on the plan would be followed by the institution of appropriate Sec. 11(e) proceedings in a district court of the United States. On September 8, 1944, an order was entered in the proceedings at bar addressed to security holders throughout the United States, which was published in newspapers in the cities of New York, Chicago, Philadelphia, Boston, Houston and Shreveport. Comprehensive news items appeared on September 9, 1944 in the New York Times, the New York Herald-Tribune, and the Wall Street Journal.

[10] The sinking fund payments are to increase progressively as interest requirements decrease in order to provide a uniform annual debt charge throughout the life of the issue.

[11] In passing, a review of the record supports the Commission's findings that the validity and rank of the $7 preferred is unassailable, and the retirement thereof is a result of prudent business considerations rather than a result of the impact of Section 11 of the Act.

Company Act Release No. 4215. The test can be applied to a number of different fact situations. In re North Continent Utilities Corporation, supra; Matter of Consolidated Electric & Gas Co., D.C.Del., 55 F.Supp. 211; In re American Gas & Power Co., D.C.Del., 55 F.Supp. 756. The particular fact situation in each case, however, is what must be examined. Here, for example, the problem becomes unusually involved in the light of the numerous unliquidated claims and equities among the different classes of security holders (which issues were raised in the consolidated proceedings of United, Electric, and Bond and Share before the Commission) and the various derivative actions brought by the stockholders of Electric and United in the New York state and federal courts.[12] The Commission analyzed all these factors be-

---

[12] For the most part the stockholders' suits raise the same issues which were investigated by the staff of the SEC as an incident to the consolidated proceedings. A list of the suits follows:

| Title of Action | Court | Plaintiff |
|---|---|---|
| William Weinberger et al., Plaintiffs, v. Serge Semenenko et al., Defendants | Supreme Court of the State of New York, New York County | Common Stockholder of United |
| Louis Levy, Plaintiff, v. Earle Bailie et al., Defendants * | Supreme Court of the State of New York, Kings Co. | Common Stockholder of United |
| Philip Steiger, Plaintiff, v. Margaret Henderson Bailee et al., Defendants | Supreme Court of the State of New York, New York Co. | Common Stockholder of United |
| Jack Levine, Plaintiff, v. Earle Bailie et al., Defendants * | Supreme Court of the State of New York, Kings Co. | Common Stockholder of United |
| Frank Palumbo et al., Plaintiffs, v. Electric Bond and Share Company et al., Defendants | U. S. District Court for the Southern District of New York | Common Stockholder of United |
| Andrew Acuzzo, Plaintiff, v. Earle Bailie et al., Defendants | Supreme Court of the State of New York, Kings Co. | Common Stockholder of United |
| Jennie Britton et al., Plaintiffs, v. Electric Bond and Share Company et al., Defendants | Supreme Court of the State of New York, Kings Co. | Stockholder of Electric |
| Rebecca Y. Rosenblatt, Plaintiff, v. H. C. Abell et al., Defendants | Supreme Court of the State of New York, Kings Co. | Stockholder of Electric |
| Henriette M. Hoffman, Plaintiff, v. Electric Bond and Share Company et al., Defendants | Supreme Court of the State of New York, Kings Co. | Common Stockholder of United |
| A. Shell Lezberg et al., Plaintiffs, v. Groesbeck, et al., Defendants | U. S. District Court for the Southern District of New York | Stockholder of Electric |
| Rebecca Y. Rosenblatt, Plaintiff, v. H. L. Dickerson, et al., Defendants | U. S. District Court for the Southern District of New York | Stockholder of Electric |
| Helen Katz, Plaintiff, v. Ernest B. Tracy, et al., Defendants | Supreme Court of the State of New York, New York County | Stockholder of Electric |
| Jeanne Koster, Plaintiff, v. Earle Bailie, et al., Defendants | Supreme Court of the State of New York, New York Co. | Stockholder of Electric |

* Consolidated with the William Weinberger action.

fore arriving at the treatment the various classes of security holders should receive. The Commission approached the difficult task by regarding the plan as affecting two settlements—one, covering the asserted claims of Bond and Share and the remaining security holders of United and particularly the claims of Electric as the principal owner of United's equity—the other, as adjusting a compromise between Electric and the public common stockholders of United. At the Commission's hearings Mr. Okin appeared as a stockholder of Bond and Share to oppose the plan. Common stockholders of United asserted the plan was too lenient to Bond and Share, too generous to Electric. Electric stockholders were of the view that the plan went beyond the mark overgenerously in favor of the public common stockholders of United. While a reading of the record of the proceedings before the SEC does not disclose another Donnybrook Fair, at least the positions taken by the different classes of security holders demonstrates that the adversary system was in full operation, and that the Commission regarded all the evidence adduced with high objectivity as to the master facts underlying all unliquidated claims and equities between the respective classes of security holders inter sese.[13]

It is here that Okin argues that in relinquishing its claims for $44,000,000 Bond and Share is not effecting a compromise and settlement of disputed claims, but is actually selling its assets in violation of Section 20 of the New York Stock Cor-

poration Law, Consol.Laws, c. 59, in that there has been no attempt to obtain the consent of the holders of record of two-thirds of its outstanding shares. Assuming, but not deciding, that the New York statute must be applied in this proceeding, under the New York authorities the statute comes into operation only where there is a sale of all assets of a corporation or of some department constituting an important element of its business. Matter of Timmis, 200 N. Y. 177, 93 N.E. 522; Matter of Miglietta, 287 N.Y. 246, 39 N.E.2d 224; Epstein v. Gosseen, 235 App.Div. 33, 256 N.Y.S. 49; Matter of Leventall, 241 App.Div. 277, 271 N.Y.S. 493. The New York law simply follows the general rule that stockholders' consent is not required where the sale involves merely a portion of the corporate property and constitutes simply an exercise of ordinary charter power, the effect of which does not work a practical dissolution of the corporate business, wholly or in some important part. The charter of Bond and Share expressly provides that it may acquire and sell securities or other evidences of indebtedness. Bond and Share's debt claim against and its stock of United are to be disposed of for $44,000,000. This amounts to approximately 12.3% of Bond and Share's total assets. Even if New York law is applicable, stockholders' consent is not required in this instance.[14]

6. After examination of the Commission's treatment of the various claims and more particularly those found in the stockholders' derivative actions, I paused to consider whether it was essential,

[13] The plan will constitute a complete settlement and discharge of all asserted unliquidated claims, equities and derivative suits. At p. 26 of its opinion the SEC stated: "In this connection it must be recognized that the plan cannot be considered nor have we considered it as a compromise negotiated at arm's-length among groups having equal bargaining power. The allocation of the new common stock between Electric and the public common stockholders of United was determined primarily by the officials of Electric who occupy the same positions in United, and, while the settlement of the Bond and Share claims was the result of negotiations between the officers of Electric and United with those of Bond and Share, both of the former companies are controlled subsidiaries of Bond and Share. We must therefore examine and consider these two settlements as being, in effect, unilateral offers of

settlement by Bond and Share and Electric, respectively, and test them against the background of the facts developed to determine whether they may be deemed fair in the light of all of such facts. However, it should not be supposed that the proceedings herein were lacking in controversy, or that the interests of public investors were unrepresented except by the companies and our staff."

[14] Whether to insist upon the payment of Bond and Share's claims in full and indulge in the lengthy litigation facing that company in the defense of the thirteen New York suits or to make a compromise and settlement, would seem to be a matter of business judgment upon which Okin as the shareholder must accept the decision of management in the absence of bad faith in the exercise of their judgment. Obviously no such bad faith has been shown.

insofar as the federal actions pending in the Southern District of New York were concerned, for the judges of that district first to approve under Rule 23(c) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, the dismissal, settlement or compromise of the various actions pending in their court before this court, as the court of approval and enforcement under Sec. 11 of the Act, should consider the plan—its rejection or approval. If Rule 23(c) is applicable, then due to the fortitous circumstance that a subject registered company may have been chronically subject to stockholders' derivative actions, a plan for one company may long be delayed in going into effect awaiting the approval of the district court of enforcement until one or many other district judges approve a particular segment of the whole plan by approving the dismissal of each derivative action, the merit of which claim has already been evaluated in the plan approved by the SEC. Where a statute such as the Public Utility Holding Company Act of 1935 discloses a congressional intent to remedy an existing economic need, the work to be done by the administrative agency and the designated court of enforcement should be done with dispatch and without duplication of federal judicial supervision. I thus interpret Rule 23 (c) as applicable to the traditional stockholders' suit where, after compromise and dismissal, the defendant corporation retains its same status and legal identity. Once a public utility holding company registers and attempts to comply with the Act by seeking court approval of its plan, that court which is properly the court to enforce such plan has exclusive jurisdiction to determine whether the plan, as well as each of its component parts, is necessary and appropriate to effect compliance and is equitable under the Act. Whether the SEC and United may be successful in having the New York derivative state and federal actions dismissed on the basis of the views here expressed, is an unknown. It will depend, of course, on the view that any one of the New York judges in the Southern District and state courts of New York may take as to the scope and operation of Rule 23(c) on the Public Utility Holding Company Act. As I am of the view that it is proper for the Sec. 11 court of enforcement to approve a compromise and settlement of a stockholders' derivative action, wherever pending, as an integral part of a plan filed in an effort to comply with the statute, which has after careful

investigation been approved by the Commission, I have paused to discuss the application of Rule 23(c) to the case at bar in order that the New York courts may have some basis upon which to exercise a judicial comity if they are so minded.

 7. Another of Okin's arguments is that neither the Commission nor the court has power to approve the compromise of Bond and Share's debt claims in the light of Sec. 26(c) of the Act. That section has no relevance here. That section was never contemplated to limit the administrative agency and the enforcement court in their examination of equitable claims of a subsidiary against its parent. Illinois Iowa Power Company v. North American Light & Power Co., D.C.Del., 49 F.Supp. 277.

8. In handling the various claims, the SEC first treated the compromise and settlement between Bond and Share and United, i.e., Bond and Share is willing to receive $44,000,000 in cash for the surrender of its entire debt claim and security interest in United. As I intend to accept the findings of fact made by the Commission, I likewise accept the outline of those facts insofar as they bear upon the proposed compromises and settlements which are an integral part of the plan sub judice. The Commission, in viewing the background of the settlements (opinion, pages 27–31) stated:

"United was organized by Bond and Share in 1930 as an intermediate sub-holding company of Electric, to consolidate the natural gas interests of Electric with those of United Gas Company ( '(old) United' ), a nonaffiliated natural gas system. Immediately prior to the organization of United, Bond and Share, through a nominee, had advanced $55,000,000 to (old) United to enable the latter to acquire certain natural gas properties of Magnolia Petroleum Company, a wholly-owned subsidiary of the Standard Oil Company of New York, and two of Magnolia's subsidiaries. The loan agreement outlined a plan of consolidation which in all important respects was carried out in the organization of United.

"Under the loan agreement Bond and Share, in addition to 6% interest per annum and a lien on the properties to be acquired by the funds advanced, obtained a pledge of the entire investment portfolio of (old) United, and was to receive without additional consideration 300,000 shares of com-

mon stock of (old) United when the plan of reorganization was declared operative. The main features of the plan were (1) the organization of United, (2) the deposit of securities of constituent companies and certain subsidiaries in exchange for securities to be issued by United, and (3) the ultimate furnishing of $60,000,000 by Electric, in addition to its contribution of the securities of Louisiana Gas & Fuel Company owned by it, for all of which Electric was to receive over $88,000,000 in second preferred stock plus a substantial portion of the common stock and option warrants.

"When, on June 3, 1930, the plan of organization of United was declared operative, United's capitalization, based on values fixed by its Board of Directors (consisting wholly of attorneys in employ of Simpson, Thacher & Bartlett, a law firm employed by Bond and Share), was stated at $248,-000,000. This exceeded by $101,000,000 the underlying book value of the securities deposited and the cash received under the plan. If additional adjustments[15] are made to eliminate inflationary items in the accounts of constituent companies the excess is discovered to have been over $167,-000,000. The investment account was written up by such amounts as were necessary to balance the watered capitalization. United thus began its life with its senior capitalization, consisting of 355,686 shares of $7 preferred and 644,600 shares of second preferred stock with an aggregate liquidating value of $100,036,600, plus $19,400,000 remaining balance on the debt to Bond and Share, considerably in excess of the actual investment in the underlying system properties and with its common stock completely under water on such basis.

"In addition, United started operations with borrowed cash approximately $243,000 in amount. At that time Bond and Share knew that tremendous amounts of money were necessary not only to meet United's daily needs and to support its top-heavy structure but also to carry forward a construction and development program which required the inter-connection and construction of new systems and the extension of old ones into new territories. The cost of this program approximated $50,000,000 and it was a foregone conclusion that United with only $243,000 in cash (the $36,000,000 of cash furnished by Electric under the plan having been used to make a payment on account of the loan from Bond and Share to (old) United which was assumed by United) would be compelled to subsist on borrowings.

"The burden of supporting United was in the first instance cast upon its parent, Electric, which advanced approximately $15,000,000 (net) to United in the first 2–½ months of the latter's existence or a rate of approximately $1,000,000 a week. Electric, in turn, had to borrow the funds it loaned to United from Bond and Share, and in September 1930 the use of Electric as a conduit was terminated. Bond and Share supplanted Electric as United's banker, and the loan account arose to the total of $52,673,000 as early as December 31, 1930.[16]

"This indebtedness, changed temporarily only in form through bank loans in 1931 and partly evidenced by debentures purchased by Bond and Share from United in 1936, forms almost all of the $53,365,000 presently stated to be owing from United to Bond and Share.

"Not only were tremendous sums required in connection with the development and construction program of United in 1930 but it was also essential to maintain a favorable dividend record in those years. Accordingly, during 1930 and 1931 over $11,200,000 in dividends were paid to the holders of preferred stocks. Such dividends, however, were at least in part derived from earnings created through grossly inadequate provisions for property retirement. Cash for the payment of such dividends was derived from the loan account. This resulted in an intricate interplay of loan accounts at all levels in the system. Dividends were paid in full on the first preferred stock until the last quarter of 1932 and on the second preferred stock until the first quarter of that year. Full quarterly dividends were resumed on the first preferred stock in September of 1936 but were never resumed on the second

---

[15] "Adjustments to underlying book values include the elimination of write-ups and inflationary items as shown in Schedules 1, 2 and 3 of Appendix B, the adjustment of values of securities owned and the elimination of deferred debits."

[16] "Although the loan account between Bond and Share and United showed a net indebtedness of $35,673,000 at December 31, 1930, two items totaling $17,000,000 of repayments were merely temporary conveniences to Bond and Share and shortly thereafter were restored to the loan account."

516

preferred stock. No dividends have ever been paid on the common stock. As has been stated, at June 1, 1944, arrearages on the preferred stock totaled $3,654,804 and on the second preferred stock $75,861,310.

"There has been no substantial change in the stated indebtedness of United since 1932. However, in 1932 and 1935 two major events occurred. In 1932 the system property accounts were written down approximately $130,000,000 to reflect a reproduction cost appraisal of system properties on the basis of 1930 price levels made by Stone and Webster Engineering Corporation and Ralph E. Davis, Inc. The write-downs of its subsidiaries' properties were reflected in the accounts of United by a corresponding credit to its investment account. In 1935 immediately prior to the enactment of the Public Utility Holding Company Act there was a re-shuffling of personnel in the Bond and Share system and for the first time the identity of senior personnel which had previously prevailed among United, Electric and Bond and Share was eliminated with respect to Bond and Share. It continued, however, as between Electric and United. This redistribution of personnel resulted in no fundamental change in control and there has never existed any real opportunity for arm's-length dealing. Bond and Share's domination of United and Electric has continued to the present.

"The next event of importance occurred in 1937 when a complex reorganization and redistribution of properties of the United Gas system took place. By reason of the reorganization United became engaged in the retail distribution of natural gas and thus became a public utility company as defined by the Act. The merging subsidiaries were variously engaged in the non-utility business of production, transmission, purchase and sale of natural gas and oil.

"From the organization of United until the present Bond and Share has received over $30,000,000 in interest and over $4,000,000 in service fees from United and subsidiaries as compared with approximately $8,300,000 in dividends on the second preferred stock and approximately $200,000 in interest received by Electric on its far greater investment. The common shareholders have received nothing. Bond and Share throughout United's history has insisted on the payment of 6% interest on sums advanced regardless of the fact that at least subsequent to 1935 there concededly was a cheap money market. Although various reasons of varying weight are assigned to explain the failure to refinance, the fact remains that all requests for reduction in interest since 1935 were denied on the ground that the rate of interest was satisfactory to Bond and Share.

"The above is an extremely brief outline of the history * * *. It is clear from all the facts and we conclude that Bond and Share was in complete control of Electric and United throughout this period. Bond and Share must be held responsible for the form and nature of the organization of United and its subsequent history and for the top-heavy capitalization of United and its lack of equity and working capital which necessitated the borrowings which make up Bond and Share's present debt claim. While Bond and Share might not be held to be responsible for the factors which prevented the roseate dreams of United's future from being fulfilled, it is clearly responsible for having taken advantage of its dominant position so as to fasten the entire cost of this failure upon the other security holders in United, primarily Electric, while ensuring that it consistently received a highly satisfactory return in its investment. In view of its fiduciary obligations as controlling parent it would, on the record before us, be entirely unfair and inequitable for Bond and Share now to be permitted to realize the entire nominal amount of its claim.[17]

"The degree to which the claims of Bond and Share in United ought in equity to be modified, so as to achieve a fair and equitable treatment of all of the security holders of United is not quite so clear. The expert witness called by certain stockholders of Electric, who participated in the hearings on the plan to contest it as overfavorable to Bond and Share, apparently conceded that a complete subordination of Bond and Share's claims would be too harsh under all the circumstances herein.

---

[17] "The legal and equitable principles applicable to the relationship of a controlling parent to other security holders in a reorganization are set forth in the Deep Rock case—Taylor v. Standard Gas & Electric Co., 1939, 306 U.S. 307 [618, 59 S.Ct. 543, 83 L.Ed. 669]—and in Pepper v. Litton, 1939, 308 U.S. 295 [60 S. Ct. 238, 84 L.Ed. 281]."

He suggested instead as the fairest solution to the problem that Bond and Share and Electric be treated as if they had been partners in the enterprise and that adjustments be made in the claims of each and therefore in their participation in the present reorganization to compensate for the inequality in the return which they have received on their investments in United.[18] Using several different methods of computation, he arrived at the conclusion, in effect, that the participation of Electric should be increased by a minimum of $6,600,000 and the amount to be received by Bond and Share should be reduced accordingly. We think it unnecessary to go into an extended analysis of the methods employed in these computations and the various questions which might have been raised from opposing points of view with respect to them. We have considered them together with the other factors bearing upon the relative equities of the respective claimants.[19] The factors are too numerous and varied to be discussed in detail and many of them are not susceptible of reduction to precise mathematical terms. It is sufficient to note the following which have seemed to us to be of considerable weight in appraising the fairness of the plan.

"It will be observed that Bond and Share has already subordinated itself to the public senior security holders of Electric and has placed itself on the same level as the public common stockholders of Electric in the amount of some $20,000,000. As is set forth in Appendix A, pages 57 to 59, when United made a call on Electric for its additional subscription of $24,000,000 of second preferred stock in October 1931, Electric raised the funds through an offering of common stock which was underwritten by Bond and Share. By reason of the precipitous decline in the market price of the common stock of Electric, Bond and Share was compelled under its underwriting to purchase the bulk of such stock at a net cost of slightly in excess of $20,000,000. The security holders of Electric thus received the benefit of Bond and Share's investment in a junior equity position of the funds composing this portion of their claim in United. While this provision of 'equity' capital by Bond and Share to Electric for investment in United can hardly be deemed to have been voluntary or to serve as a legal bar to the assertion of Electric's or United's claims, we believe that it is a factor which is entitled to consideration in balancing the conflicting equities.

"The subordination of Bond and Share's interests in the additional amount of approximately $11,000,000 as proposed in the plan substantially improves United's capital structure and also, through United's second preferred stock, inures in large part to the benefit of Electric's outstanding securities. Prolonged litigation might, it is true, result in establishing claims against Bond and Share aggregating more or less than $11,000,000—the amount of which neither we nor any one else can predict. In this connection, however, we note that all the plaintiffs in the suits pending before the State and Federal Courts in New York have accepted the proposal embodied in the plan and have agreed to a dismissal of their complaints.

"Prompt settlement of the claims asserted against Bond and Share in the derivative suits and in the proceedings before us is an important factor to be considered in determining the fairness of the plan. The refinancing of United cannot well be carried out while these claims are being pressed, in view of Bond and Share's creditor position with respect to United and the latter's need for cash with which to redeem its $7 preferred stock. Meanwhile, under United's present capital structure, the annual charges senior to the claims of Electric total $6,542,525 per year as compared with senior charges, under the proposed capital structure of United, of $3,250,000 per year.[20] The resultant saving of $3,292,525 per year is a measure of the benefits accorded to United under the plan, which accrue principally to Electric's public security holders. It is obvious that, by

---

[18] "This witness did not concern himself with the treatment to be afforded to the public common stockholders of United."

[19] "That a reorganization tribunal has both the power and duty to adjust the participation of the respective claimants so as to achieve an equitable result without adherence to any single rigid formula is made clear in American United Mutual Life Insurance Co. v. City of Avon Park, 1940, 311 U.S. 138, at [page] 146 [61 S.Ct. 157, 85 L.Ed. 91, 136 A.L.R. 860]."

[20] "An interest rate of 3-1/4% as assumed by the company, solely for purposes of computation. See pro forma income statements supra."

reason of this factor alone, the cost of any protracted delay might well outweigh the potentiality of gain to United or Electric that might result from continued litigation.[21]

"The resolution of the problems of United under Section 11(b) (2) of the Act and of the many controversies and claims which have arisen from its history will of course be considerable benefit to all persons directly or indirectly interested in its parent companies. It will greatly facilitate the process of bringing both Electric and Bond and Share into conformity with the Act and will remove a substantial portion of the uncertainties which have blocked their progress.

"Taking all the relevant circumstances into account we find that the settlement of the claims of and against Bond and Share provided by the plan is fair and equitable both to Bond and Share and Electric."

The give-and-take between Electric and the public common stockholders of United results in Electric's divestment of all of the $7 second preferred stock of United (with a liquidating claim of $88,468,000 plus $73,280,993, accumulated dividend arrearages as of December 31, 1943), as well as 3,795,086 shares of the present $1 par common stock held by it and it will receive 10,108,101 shares (94.9%) of the new $10 par common stock.[22] The publicity held common stock turns in 3,271,207 shares of present common (with an aggregate par value of $3,271,207) and will receive 545,- 201.2 shares (5.1%) of the new common stock of an aggregate par value of $5,452,- 012.

▪▪▪▪ In addition to those received by the Commission, this court is in receipt of a number of letters from objecting common stockholders of United. None of these persons appeared at the hearing. But their objections have been considered. These particular stockholders think that the plan is unfair because the market value of the new stock to be received by them will be less than the market price paid by them when they purchased their shares.

The original market price paid by such stockholders is not alone persuasive in determining the present equity of their claims on a reorganization exchange basis. The purpose of the Act is to attempt to preserve whatever present equity exists before such shares are completely submerged. Here, already the equity behind United's common is steadily growing smaller. This equity, when looked at beneath the large amount of outstanding senior securities and the heavy dividend arrearages, proves that the present common's possibility of participating in earnings is extremely remote. Again, the quantum of participation that they will receive depends upon what is a fair and equitable participation, apart from their contractual rights or their original purchase price. See In re United Light & Power Company, supra. There can be no mathematical evaluation of the claim of United's common stockholders. While this stock was originally issued in exchange for stock of doubtful value at the time of Bond and Share's acquisition of control over United, at no time did it represent more than an inconsequential equity in both assets and earnings. The public's investment in the second preferred represents a substantial new equity investment made by the public security holders of Electric. The Commission correctly concluded, I am of opinion, that there would seem to be little justification for giving an equity status to United's common stock of the same dignity to be given to the public investors in Electric, whose interests are represented by the second preferred stock. As stated (opinion, page 33) by the Commission:

"The present plan, in providing for settlement of the claims asserted by the public common stockholders of United for approximately $5,500,000 par value in new common stock (having applicable earnings of between $350,000 and $400,000 per year with no preferred stock or dividend arrears ahead of it) gives them a far better security than the present United common has ever been. From the point of view of Electric, in addition to the value to Electric

---

[21] "Even in the event of appeals from the order of the District Court, if that Court should approve the plan this factor will not be present to the same degree by reason of the provisions as to interest contained in the plan, see Section entitled 'The Proposed Plan', supra."

[22] The plan also calls for Electric's surrender of 3,600,040 option warrants. As these warrants are without value, the Commission properly gave such surrender no weight in allocating the new common stock.

of disposing of the claims, it should be noted that the late Joe H. Gill, president of United and Electric, testified that substantial tax benefits will flow from granting a participation to the publicly-held common stock in excess of 5% rather than some lesser amount.

"We conclude that the settlement proposed in the plan is fair and equitable as between Electric and the public common stockholders of United."

■ Originally, the $7 preferred stock was issued for debt and preferred stocks of (old) United at the time of United's organization. There are, however, no claims against these shares held by the public. While the record before the SEC shows that, in view of the amount of dividend arrearages which were rapidly being reduced, this stock might still remain as a part of United's capital structure under the requirements of Sec. 11(b)(2) of the Act, nevertheless that feature of the plan which contemplates the redemption of these shares, and the substitution of a new low-interest bond, is fair and equitable, especially where, apart from any attempt to comply with the Act, United has the right, under its certificate of incorporation and the Delaware Corporation Law, Sec. 27 Rev.Code of 1935, c. 65, § 2059,[23] to exercise the redemption privilege, and especially where the publicly owned $7 preferred is made whole in receiving its full contract rights—its redemption price of $110 per share plus all accrued and unpaid dividends.

■ The cancellation of all outstanding option warrants without compensation is bottomed on a realistic evaluation of the worth of such paper, originally issued as a form of "bonus" in connection with the sale of other securities of United. The holders of such warrants may purchase present common stock for $33.33 a share. The right in view of common's under water position has practically long since ceased to exist. To modify the terms of the warrants in accordance with the treatment given to the present common stock under the plan would give the holders of the warrants the right to purchase a share of the new $10 common at something between $220 and $330 a share. It would obviously be unfair to hold out to investors the hope that at some remote time the option warrants will have value. While there might be situations where holders of option warrants should be permitted to participate in a plan under the United Light & Power doctrine, this is not the case.

■ The findings of the Commission are approved, as well as its disposition of certain exceptions taken to the rulings of the trial examiner. The features of the plan whereby the SEC is to approve (has, in fact, already approved) the fees and expenses to be paid by United or Electric to the plaintiffs and their attorneys in the court actions referred to in footnote 12 and those fees and expenses as to which the Commission has reserved jurisdiction, are not untraditional administrative methods as such allowances contemplate court approval. The total costs of disposing of 14 derivative stockholders' suits for the sum of $174,884.50, arrived at by United's management dealing at arm's-length bargaining, is not an alarming figure in view of the substantial amounts involved. Such elimination by the administrative agency of what could very well turn into a long and interminable series of controversies over fees if this particular matter were to be heard in this court de novo, is a matter which finds, in this particular case, judicial approval.

Accordingly, the holding is that the plan is not only fair and equitable to the security holders affected but that it is also necessary and appropriate to effectuate the provisions of the Act. Separate findings under Rule 52(a) have been filed.

---

[23] See note 14 supra.