## SECURITIES AND EXCHANGE COMMISSION v. DREXEL & CO.

No. 153.   Argued February 9, 1955.—Decided February 28, 1955.

*William H. Timbers* argued the cause for petitioner. With him on the brief were *Solicitor General Sobeloff, Myron S. Isaacs* and *Elizabeth B. A. Rogers.*

*Arthur H. Dean* argued the cause for respondent. With him on the brief were *Henry S. Drinker, Thomas Reath* and *John Mulford.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The question in the case is whether the Securities and Exchange Commission has jurisdiction to pass on a fee to be paid by Electric Bond & Share Co. to Drexel & Co. in connection with a reorganization plan filed by its subsidiary, Electric Power & Light Corp., under § 11 (e) of the Public Utility Holding Company Act of 1935, 49 Stat. 803, 15 U. S. C. § 79a *et seq.* We hold that the Commission does have jurisdiction.

The problem arises out of the unraveling and reorganization of the vast empire of Bond & Share, pursuant to the command of the Act. The present case is one of several phases of the various reorganization plans adopted to bring the system into compliance.[1] The instant phase of this system's reorganization grew out of the filing of a voluntary plan of reorganization under § 11 (e) by Electric.

Electric owned operating subsidiaries in several States and in Mexico. The plan provided that (1) Electric would transfer to a new holding company, Middle South Utilities, Inc., its holdings in those operating subsidiaries, as well as certain other assets; (2) preferred stocks of Electric would be retired by distributing to those security holders shares of Middle South and shares of another subsidiary of Electric; (3) the remaining shares of Middle South and the other subsidiary would be distributed to

---

[1] For various phases of the reorganization of this holding company system, see: (1) *Electric Bond & Share Co.*, 9 S. E. C. 978; *id.*, 12 S. E. C. 392; *id.*, 20 S. E. C. 615; *id.*, 21 S. E. C. 143; *id.*, 22 S. E. C. 866; (2) *Electric Bond & Share Co.*, 11 S. E. C. 1146, aff'd *sub nom. American Power & Light Co.* v. *Securities and Exchange Commission*, 141 F. 2d.606, 329 U. S. 90; *American Power & Light Co.*, 21 S. E. C. 191; (3) *United Gas Corp.*, 16 S. E. C. 531, aff'd *sub nom. In re United Gas Corp.*, 58 F. Supp. 501, 162 F. 2d 409; and (4) *Electric Bond & Share Co.*, 20 S. E. C. 786.

the holders of the common stock and of the warrants of Electric; and (4) Bond & Share would pay Electric $2,200,000 in settlement of intrasystem claims.

The plan filed by Electric under § 11 (e) required Bond & Share to do three things: *first,* sell or exchange its holdings of Electric stock; *second,* acquire in exchange the shares of Middle South and the other subsidiary; and *third,* pay the cash amount in settlement of the intrasystem claims. It was not sufficient for Bond & Share that Electric get approval for its plan under § 11 (e). It was also necessary by the terms of the Act that Bond & Share also get the Commission's approval of the steps required of it.

Bond & Share's exchange of its securities for the new securities was a "sale" under the Act, for "sale" includes "exchange." § 2 (a)(23). Bond & Share is a registered holding company. No "sale" of securities can be made by a registered holding company without Commission approval. That is the command of § 12 of the Act.[2] That approval is obtained, as § 12 shows,[3] by a procedure which submits the fees in connection with the sale to the scrutiny and approval of the Commission.

Bond & Share's receipt of the new securities was an "acquisition" within the meaning of the Act. § 2 (a)

---

[2] Section 12 (d) provides:

"It shall be unlawful for any registered holding company, by use of the mails or any means or instrumentality of interstate commerce, or otherwise, to sell any security which it owns of any public-utility company, or any utility assets, in contravention of such rules and regulations or orders regarding the consideration to be received for such sale, maintenance of competitive conditions, fees and commissions, accounts, disclosure of interest, and similar matters as the Commission deems necessary or appropriate in the public interest or for the protection of investors or consumers or to prevent the circumvention of the provisions of this title or the rules, regulations, or orders thereunder."

[3] *Supra,* note 2.

(22). That "acquisition" was made subject to the jurisdiction of the Commission by § 9 (a).[4] That approval could be had only by submitting the "acquisition" to the Commission's scrutiny pursuant to § 10 of the Act, a scrutiny that includes supervision of the fees paid by the holding company in connection with the "acquisition."[5]

Bond & Share's cash payment in settlement of the intra-system claim was incident to the "sale" under § 12 and the "acquisition" under § 10. And, as noted, all three transactions by Bond & Share were parts of the plan filed by Electric under § 11 (e).

Bond & Share, therefore, filed an application pursuant to §§ 10, 11, and 12 of the Act, asking for the Commission's approval of the transactions which the plan required of it.[6]

---

[4] Section 9 (a) provides in relevant part:

"Unless the acquisition has been approved by the Commission under section 10, it shall be unlawful—

"(1) for any registered holding company or any subsidiary company thereof, by use of the mails or any means or instrumentality of interstate commerce, or otherwise, to acquire, directly or indirectly, any securities or utility assets or any other interest in any business."

[5] Section 10 (b) provides in relevant part:

"If the requirements of subsection (f) are satisfied, the Commission shall approve the acquisition unless the Commission finds that—

.        .        .        .        .

"(2) in case of the acquisition of securities or utility assets, the consideration, including all fees, commissions, and other remuneration, to whomsoever paid, to be given, directly or indirectly, in connection with such acquisition is not reasonable or does not bear a fair relation to the sums invested in or the earning capacity of the utility assets to be acquired or the utility assets underlying the securities to be acquired; . . . ."

[6] A petition for rehearing states that Electric is not a "public utility company" within the meaning of the Act and therefore § 12 (d) is inapplicable. We do not prejudice that position by this opinion, for whether or not Electric is a "public utility company," § 12 of the Act is concededly applicable. Section 12 (c) provides:

"It shall be unlawful for any registered holding company or any subsidiary company thereof, by use of the mails or any means or

The Commission consolidated the proceedings involving Electric's plan and Bond & Share's application and heard them together, and on March 7, 1949, entered one order in the consolidated proceedings, approving both. As respects Bond & Share the order said, "IT IS FURTHER ORDERED that the application-declaration of Bond and Share referred to above be and it is hereby granted and permitted to become effective." As respects the plan of Electric, the Commission in the same order gave its approval, subject to additional terms and conditions, the second of which reads:

> "That jurisdiction be and hereby is specifically reserved to determine the reasonableness and appropriate allocation of all fees and expenses and other

instrumentality of interstate commerce, or otherwise, to declare or pay any dividend on any security of such company or to acquire, retire, or redeem any security of such company, in contravention of such rules and regulations or orders as the Commission deems necessary or appropriate to protect the financial integrity of companies in holding-company systems, to safeguard the working capital of public-utility companies, to prevent the payment of dividends out of capital or unearned surplus, or to prevent the circumvention of the provisions of this title or the rules, regulations, or orders thereunder."

Section 12 (f) provides:

"It shall be unlawful for any registered holding company or subsidiary company thereof, by use of the mails or any means or instrumentality of interstate commerce, or otherwise, to negotiate, enter into, or take any step in the performance of any transaction not otherwise unlawful under this title, with any company in the same holding-company system or with any affiliate of a company in such holding-company system in contravention of such rules and regulations or orders regarding reports, accounts, costs, maintenance of competitive conditions, disclosure of interest, duration of contracts, and similar matters as the Commission deems necessary or appropriate in the public interest or for the protection of investors or consumers or to prevent the circumvention of the provisions of this title or the rules and regulations thereunder."

The broad powers granted the Commission under these provisions are plainly adequate to give it the control it reserved in this case over the fees incident to the exchange of the old securities.

346

remuneration incurred or to be incurred in connection with the said Plan, as amended, and the transactions incident thereto, other than the fairness and reasonableness of the fees and expenses incident to the stockholders' actions enumerated in Part II of the Plan, as amended."

It is said, however, that that reservation was "the reservation regarding . . . the fees in connection with Electric's plan under § 11, and cannot be made to supply the failure to fix or to reserve the matter of fees in the proceedings under §§ 10 and 12 in relation to which they were incurred."

There are two answers to that argument. *First,* the reservation was made in the § 10 and § 12 proceedings, for they were consolidated with the § 11 proceedings and one order entered in all three. *Second,* the order in the consolidated proceedings reserved jurisdiction over the fees and expenses incurred not only "in connection with the said Plan" but also in connection with "the transactions incident thereto." The latter obviously included the matters under § 10 and § 12, for they were the chief collateral ones before the Commission at the time. The parties so understood it, for Bond & Share and Drexel filed petitions for approval of the Drexel fee, invoking the reserved jurisdiction of the Commission. The Commission held hearings and fixed a fee for Drexel[7]

---

[7] Bond & Share asked that it be reimbursed by Electric for this fee. The Commission denied reimbursement, saying that Bond & Share's services in the proceedings "were not services merely designated to bring Electric into compliance with the Commission's order but were additionally, if not primarily, steps designed to simplify the Bond and Share system and Bond and Share itself at the apex of that system. . . . Any plan for the compliance of the subholding companies must necessarily have been as a step toward the ultimate resolution of Bond and Share's overall Section 11 problems which were its primary concern." Bond & Share took no step to contest that action.

which neither Drexel nor Bond & Share thought adequate.[8] The Commission applied to the District Court for approval of this and other fee and expense orders. The District Court approved. The Court of Appeals affirmed, except for the order as to Drexel; and as to that it reversed "for lack of jurisdiction in the Commission." 210 F. 2d 585, 592.

We see no such infirmity in the Commission's order. The Commission plainly has power under § 10 and under § 12 to fix the fees payable by Bond & Share. To be sure, the Commission did not fix any fee, when on March 7, 1949, it entered the consolidated order approving the applications under §§ 10, 11, and 12. That order merely reserved jurisdiction to determine the reasonableness of the fees. There is a suggestion that no reservation of jurisdiction over the fees is possible, at least so far as § 10 is concerned, since § 10 directs the Commission to approve the plan unless it finds the fees unreasonable. But the reservation by the Commission of jurisdiction over the fees is merely a means of assuring that they will not be unreasonable. Certainly, the Commission need not hold an entire plan in abeyance until it completes hearings on the fees to be paid in connection with one phase of it. We see no reason why the Commission, in the interest of orderly administration, cannot defer consideration of all the fees, until it has time to view the entire matter in perspective and evaluate the worth of each contribution. We would have to read the Act with an extremely hostile eye to deny the Commission that administrative leeway.

The error of the Court of Appeals was in overlooking the essential and critical role that §§ 10 and 12 play in the case and in relying on § 11 (e) alone.

The contrast between §§ 11 (e) and 11 (f) is plain, so far as jurisdiction over fees is concerned. Section 11 (f)

[8] Bond & Share asked $100,000 for Drexel. The Commission awarded $50,000.

348

contains an express provision concerning fees. The subsection, applicable to court proceedings where a receiver or trustee has been appointed, makes all fees "to whomsoever paid" subject to the approval of the Commission. Cf. *Leiman* v. *Guttman*, 336 U. S. 1. Section 11 (e) contains no such provision. It merely directs the Commission to approve the plan, if it finds the plan "fair and equitable to the persons affected." The amount of fees to be paid by Electric plainly would be relevant to the question whether the plan was fair and equitable. See *In re Public Service Corp. of New Jersey*, 211 F. 2d 231, 232. Payment of excessive fees was one of the historic abuses of the reorganization procedure whereby utility companies were milked, an abuse the Public Utility Holding Company Act sought to correct. 79 Cong. Rec. 4607; S. Rep. No. 621, 74th Cong., 1st Sess. 33. Questions of fees payable by and to protective committees present special considerations irrelevant here and we put them aside. Cf. *Leiman* v. *Guttman, supra.* Different considerations come into play when fees payable by individual security holders to their own counsel are involved. It would seem, for example, that the amount which a stockholder, say, agreed to pay his lawyer for representing him in a § 11 (e) proceeding would be no business of the Commission. The amount of that fee would seem to have no direct bearing on the fairness of the plan.

But the fees payable by the registered holding company in connection with the reorganization of its subsidiary or affiliate are, or may be, different. At least Congress thought so, for Congress was explicit in making the fees payable by them, in connection with the transactions covered by § 10 and by § 12, subject to Commission approval. Congress had before it the detailed record of holding company activities and knew that many of them had a proclivity for predatory practices. The fees were not only large; they were often loaded on affiliated

companies [9] and concealed in intrasystem accounts. Congress decided to put an end to the worst of these practices and control the critical ones. When it came to the intricacies of holding company finance, Congress expressed the desire to have the amount of the fees paid brought to light and to have the Commission decide who pays them and what amounts are reasonable. We cannot be faithful to that statutory design without granting the Commission the jurisdiction asserted here.

*Reversed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BURTON joins, dissenting.

Fully aware of the complicated interrelations of holding-company systems, Congress did not enact a scheme for severance of all intercorporate relations among public utility interests. Instead, specific provisions were devised against specific abuses and the Securities and Exchange Commission was given specific authority to effectuate the defined functions of these different provisions. Enforcement of the Act entailed authorization by the Commission of reorganization to secure simplification of a holding-company system and regulation of transactions involving acquisitions and dispositions. Duly mindful of the abuses of excessive fees in the conduct of inter-company affairs, Congress effectively equipped the Commission with power to regulate fees in the various proceedings which required approval by the Commission. But Congress particularized. It did not vest this fee-fixing authority of the Commission in a comprehensive provision. It dealt with the problem distributively. It was

---

[9] When Bond & Share asked that Electric reimburse it for the fees paid Drexel (see note 7, *supra*), it was following a traditional holding company practice of using the affiliated companies as convenient pocketbooks of the system.

explicit in relating the power to fix fees to the particular proceeding.

The matter before us relates to the fixing of fees in a proceeding under § 11 of the Holding Company Act. That was a proceeding for the reorganization of Electric, a subsidiary of Bond and Share. That section gave the Commission full power to fix fees to be paid by Electric as a condition to approval of its plan for reorganization. To be sure, Electric's plan involved the parent, Bond and Share, and the confirmation of Electric's plan required approval by the Commission of "acquisition" by Bond and Share of new securities. That approval under § 10 subjected the fees which Bond and Share could pay Drexel to the scrutiny and approval of the Commission. The consummation of Electric's plan likewise involved a "sale" by Bond and Share under § 12. Again, that section made Bond and Share's payment of fees to Drexel subject to the Commission's approval. The Commission gave the required approval to the "acquisition" and "sale" under §§ 10 and 12, respectively, without passing on the fee payable by Bond and Share or reserving the question of the propriety of such fees. The reservation regarding fees in the proceedings of Electric was applicable to the fees in connection with Electric's plan under § 11, and cannot be made to supply the failure to fix or to reserve the matter of fees in the proceedings under §§ 10 and 12 in relation to which they were incurred.

The Holding Company Act of 1935 is a reticulated statute, not a hodge-podge. To observe its explicit provisions is to respect the purpose of Congress and the care with which it was formulated.

I would affirm the Court of Appeals.